**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 99-10326

_____


UNION PACIFIC RESOURCES GROUP, INC.;
BIG ISLAND TRONA CO.,

Plaintiffs-Appellants,

versus

RHÔNE-POULENC, INC.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Texas

_____

April 5, 2001

Before GARWOOD, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Union Pacific Resources Group, Inc. ("UPRG") and its wholly owned subsidiary, Big Island Trona Co. ("Big Island"),[1] brought this diversity action against Rhône-Poulenc, Inc. ("RPI"), asserting claims of conversion, securities fraud, negligent misrepresentation, and fraud. The district court granted summary judgment for RPI, dismissing all claims, and UPRG timely appealed. We conclude that summary judgment was properly granted on the

_____

[1]Hereafter, UPRG and Big Island will be referred to collectively as "UPRG" unless otherwise noted.

conversion, negligent misrepresentation, and securities fraud claims and affirm for essentially the reasons assigned in the district court's well-reasoned opinion.[2] Concluding that UPRG has presented sufficient evidence to defeat RPI's summary judgment motion on the fraud claim, however, we reverse the district court's dismissal of that claim and remand for proceedings consistent with this opinion.

## I.

### *Facts and Proceedings*

This action arose from RPI's sale of all of its stock in two of its subsidiaries, Rhône-Poulenc of Wyoming Holding Company ("Holding") and Rhône-Poulenc of Wyoming Company ("RPW"). The purchaser was OCI America, Inc. ("OCI"). Prior to that sale, which closed effective February 29, 1996, RPI owned 100 percent of the outstanding stock of Holding and 80 percent of the outstanding stock of RPW. UPRG owned the remaining 20 percent of the outstanding stock of RPW.

Just over five years earlier, in an amended and restated agreement dated December 5, 1991 (the "partnership agreement"), UPRG, acting through Big Island, and RPI, acting through Holding, had (along with RPW) formed Rhône-Poulenc of Wyoming Limited Partnership (the "Wyoming partnership" or "Green River"). RPI's wholly owned subsidiary, Holding, was an initial general partner

---

[2]See Union Pac. Resources Group, Inc. v. Rhône-Poulenc, Inc., 45 F. Supp.2d 544 (S.D. Tex. 1999).

2

with a 50.49 percent majority interest in the Wyoming partnership; UPRG's wholly owned subsidiary, Big Island, was an initial general partner with a 48.51 percent minority interest in the Wyoming partnership. The remaining 1 percent was owned by RPW, as a limited partner.[3]

The principal business of the Wyoming partnership was the operation of a trona mine and manufacturing plant at Green River, Wyoming.[4] Under the partnership agreement, RPI's subsidiary, Holding, assumed the obligation to provide day-to-day management, staffing, and technological support for Green River, as well as the responsibility to prepare budgets and capital expenditure programs for approval by the other partners. Through a series of transactions, these obligations were indirectly assumed by RPI, which performed the functions of managing partner for the Wyoming partnership.[5]

RPI also agreed to make participation in two pension plans

---

[3]By virtue of their respective ownership interests, RPI had a 51.29 percent equity interest in the Wyoming partnership (50.49 percent through Holding and 80 percent of 1 percent through RPW), and UPRG had a 48.71 percent equity interest therein (48.51 percent through Big Island and 20 percent of 1 percent through RPW). RPI's controlling interest in the Wyoming partnership was 51.49 percent by virtue of the 50.49 percent ownership through Holding and its 80 percent control of RPW's 1 percent.

[4]Trona is a naturally occurring gray or white mineral used as a source of sodium compounds, frequently in the manufacture of glass.

[5]Hereafter, RPI and Holding will be referred to collectively as "RPI" unless otherwise noted.

("the plans") sponsored and administered by RPI available to all eligible employees of Green River. One of those RPI plans, Plan 1674, was for salaried employees; the other, Plan 1679, was for hourly employees. RPI did not maintain these plans exclusively for Green River employees; on the contrary, a substantial number of employees of RPI and others of its subsidiaries unrelated to Green River were participants in the plans. Neither UPRG nor Big Island was a sponsor of the plans: Neither company had legal control over either plan, and neither company had the legal right of direct access to any plan records or to any books, records, or reports relating to them.

The plans were ERISA-qualified defined benefit plans, entitling participating employees to fixed periodic payments at retirement. In addition, as defined benefit plans, they owned a common pool of assets rather than segregated accounts with separate assets for individual participants or groups of individual participants. Typically, all plan assets were held in trust for the exclusive benefit of the plans' participants and their beneficiaries, and to defray RPI's costs of administering the plans.

To fund the plans for the participating Green River employees, RPI (1) made contributions of its 51 percent ratable share directly to the Wyoming partnership, and (2) charged UPRG's 49 percent

4

ratable share to its partner's account in the Wyoming partnership.[6] Then, as managing partner, RPI caused a sum equal to the total of those two amounts to be transferred in cash directly from the Wyoming partnership to the trustees of the plans. According to audited financial statements prepared for the Wyoming partnership on a yearly basis, the plans were funded to "provide for benefits attributable for services rendered to date, as well as for those expected to be earned in the future" (emphasis added). This indicates that RPI intended for the plans to be funded at the higher "projected benefit obligation" ("PBO") level, rather than at the minimum "accrued benefit obligation" ("ABO") level.[7]

In September, 1995 RPI contacted its actuaries, Coopers & Lybrand ("Coopers"), by mail relative to what it referred to as a "potential spinoff" of its interest in Green River, inquiring about

_____

[6]UPRG's partnership contributions were apparently charged by RPI on a lump-sum basis, with no details provided as to what amounts, if any, were allocated to funding the plans.

[7]"PBO"(Projected Benefit Obligation) and "ABO" (Accrued Benefit Obligation) are actuarial terms that describe two different levels at which the liability of pension plans can be calculated. PBO is the actuarial present value of all benefits attributed to past employee service, based on assumed future compensation levels. ABO differs from PBO in not taking into account the effect of actuarial projections of future salary. Thus, PBO is always larger than ABO, but neither is necessarily an actual funding figure. Based on the summary judgment record as supplemented by post-argument filings ordered by this court, it is now clear that, at all relevant times, the actual market value of the assets held by the plans ranged somewhere between ABO and PBO, and on occasion even exceeded PBO. An affidavit of Matt Sicking, an independent actuary for UPRG, concluded that the Wyoming partnership's allocated pension cost was determined with PBO, not ABO.

the funding status of the plans.  In a responding letter dated October 13, 1995, Coopers  provided  RPI with the estimated value of assets and liabilities of the plans as of August 1, 1995.  These estimates included calculations of the PBO and ABO of each  plan.  According to Coopers's estimates, the then-present market value of assets in both plans exceeded the plans' ABO levels substantially.  (Post-argument memoranda reveal that the actual funding level of Plan 1679 was in excess of PBO on January 1, 1996 and at other relevant times.)

Ten days later, on October 23, 1995, RPI formally notified UPRG that it intended to sell all of its stock in Holding and RPW and thereby transfer its entire interest in the Wyoming partnership to OCI.  As expressly required by the partnership agreement, RPI officially informed UPRG of the interest that RPI proposed to sell (100 percent of its interest in the Wyoming partnership), to whom the interest would be sold (OCI), and the purchase price ($150 million).[8]  Under the partnership agreement, UPRG had a right of

_____

[8]Section 10.4(a) of the partnership agreement provides:

> Should any Partner or Interest Holder (the "Seller") propose to transfer any of its Interest in the Partnership, such Seller shall first obtain a bona fide written offer (the "Purchase Offer") for the purchase thereof from a responsible purchaser (the "Purchaser") who is ready, willing, and able to purchase the same, which offer shall provide for a purchase price payable in cash of the lawful money of the United States of America or other "hard" currency.  The Seller shall give the other Partners (the "Offerees") written notice by registered or certified mail, the notice to be accompanied by a photostatic copy of such Purchase Offer.

first refusal ("ROFR") to acquire the interest in the partnership on the same terms for which RPI proposed to sell that interest. The partnership agreement also required that the consent of the non-transferring partners be obtained before the transferee of a general partner could be admitted to the Wyoming partnership as a general partner.

In addition, a shareholders' agreement governing RPI's and UPRG's stock ownership in RPW granted a ROFR to each shareholder in the event that the another shareholder wished to sell some or all of its stock in RPW.  Under the terms of both the Wyoming partnership agreement and the RPW shareholders' agreement, UPRG had thirty days following receipt of written notice of RPI's intent to sell within which to decide whether to exercise these ROFRs.

On the same day that RPI formally notified UPRG of the proposed transfer of interest to OCI, it also sent to UPRG, under separate cover, a copy of the 113-page draft stock purchase agreement (the "purchase agreement") between RPI and OCI.  In the letter of transmittal, the president of RPI assured UPRG that "[w]e have emphasized to [OCI] the openness of our working relationship with you, and as a result, the excellent quality of our partnership meetings and discussion" (emphasis added).  In correspondence with UPRG approximately one week later, RPI stressed the fact that the

---

Such notice shall specify [1] the Percentage Interest to be transferred (the "Offered Interest"), [2] the name of the proposed purchaser, and [3] the price for which such Offered Interest is proposed to be transferred.

partnership agreement did not "require that we deliver the Stock Purchase Agreement since [the partnership agreement] specifies only that we have to notify you of the interest to be transferred and the identity of the purchaser." RPI expressly reassured UPRG that RPI had nevertheless "provided additional perspective and information in the spirit of openness" (emphasis added). In both letters, the word "openness" appears to operate as the functional equivalent of the term "full disclosure."

Three provisions of the extensive RPI/OCI purchase agreement are directly relevant to this appeal. First, section 1.02 provides that the cash purchase price for RPI's interests in Holding and RPW would be $150 million, "as such cash amount may be adjusted from time to time, both prior to and after the Closing, pursuant to section 1.03." Second, section 1.03 provides that the purchase price "shall be reduced" in an amount equal to 51 percent of the difference between the ABO and PBO of the pension plans to the extent allocable to coverage of Green River employees.

Third, section 8.04 of the purchase agreement required OCI to ensure that Green River employees who were participants in Plans 1679 and 1674 immediately prior to closing would be covered by "substantially similar" pension plans after the sale. As the potential purchaser, OCI agreed to assume liability for the accrued benefits of the Green River employees as those benefits came due from and after closing. In section 8.04(b), RPI agreed that, as soon as practicable after the closing, it would cause assets to be

8

transferred from its pension trust to OCI "in an amount equal to the [ABO]" of the plans to the extent allocable to the participating Green River employees. Although RPI had already received from Coopers its determination of the ABO, PBO, and actual market value of the plans as of August 1, 1995, RPI elected not to share that information or subsequent updates of those data with UPRG.

UPRG's receipt of the draft RPI/OCI purchase agreement touched off a flurry of correspondence between UPRG and RPI, concerned primarily with the tolling of the thirty-day ROFR period,[9] the consent provisions of the partnership agreement, UPRG's objections to several particular provisions related to a $70 million note, and UPRG's requests for additional information about the purchase agreement, specifically some exhibits and schedules referenced in the purchase agreement that RPI had failed to attach.

Finally, on November 27, 1995, after fourteen letters concerning various aspects of the transaction had passed among the parties and OCI, UPRG confirmed to RPI that it would not exercise

---

[9]After receiving the purchase agreement, UPRG informed RPI that it had failed to attach many of the exhibits and schedules referenced in the purchase agreement. UPRG also informed RPI that "it is our view that the 30-day period for election . . . has not commenced and will not commence until we receive a complete set of documents that allows us to complete our review of the offer." Although RPI complied with UPRG's request and provided the missing documents, RPI insisted that the 30-day ROFR period had begun on October 23, when formal notice of the divestiture had been sent to UPRG, and would conclude on November 22.

its ROFRs. By letter dated November 28, 1995, UPRG formally granted its consent to the proposed transaction, but expressly conditioned its approval "on our review of the final executed Stock Purchase Agreement, with complete exhibits and attachments, and a determination that [the Stock Purchase Agreement] contains no terms or provisions which would directly or indirectly affect any existing rights or obligations of UPRG or impose any additional liabilities" (emphasis added). On November 29, 1995, RPI and OCI executed the purchase agreement. Two months later, RPI complied with filing requirements of the Internal Revenue Service ("IRS") by giving notice of the intended transfer of assets from its pension trusts to OCI's new plans. Attached to each form was an actuarial statement of valuation certifying that the transfers were in accordance with IRS regulations.

Just before the February 29, 1996 closing, RPI received a letter from Coopers dated February 22, warning RPI that, as structured, the sale would result in the new OCI plans being underfunded by an estimated $3-4 million. Coopers further cautioned RPI that the Pension Benefit Guaranty Corporation ("PBGC"), which regulates such matters, could require RPI to contribute an additional $3-4 million into the new OCI plans.[10]

_____

[10]The February 22, 1996 letter from Coopers to RPI stated: "The PBGC is focused on transactions that increase the PBGC's financial risk. In particular they are concerned with situations where strong companies spin off weak subsidiaries along with underfunded pension plans. This may be the case with the transaction (we estimate that the spun off plans will be underfunded by $3 million

10

Coopers advised RPI on ways to avoid the underfunding problem: One way would be to infuse at least $3-4 million into the OCI plans after the transfer; another would be to agree to provide "credit" to OCI should OCI be unable to meet its future funding commitments to the plans.[11] None of this information was furnished currently to UPRG.

On February 28, 1996, the day before the effective date of the closing, RPI and OCI updated the purchase agreement to specify the amount of the reduction in purchase price provided for in section 1.03. The agreed amount of the reduction was $3,832,000, based on actuarial calculations of ABO and PBO as of the closing date.[12] Also, the purchase agreement was amended to acknowledge that "100 [percent] of the cost accrued by [RPI] for the provision of . . . pension plan coverage for Wyoming Employees and Former Employees . . . has been separately and specifically charged to, and has been fully reimbursed by, the Wyoming Partnership."[13] None of this information was furnished currently to UPRG.

---

to $4 million)."

[11]RPI did not follow either of these suggestions from Coopers.

[12]RPI's actuaries arrived at this figure by first calculating PBO for the Green River employees to be $20,464,087 and ABO to be $13,070,205. The difference of $7,393,882 between PBO and ABO was then multiplied by 51%, in accordance with section 1.03 of the purchase agreement.

[13]This provision was not in the draft purchase agreement that RPI had furnished to UPRG, which classifies this as another example of RPI's pattern of selective disclosure calculated to avoid alerting UPRG to potential problems for it.

11

The sale from RPI to OCI closed effective February 29, 1996. Weeks after the closing, a letter from RPI to Coopers dated March 18, 1996 confirmed that RPI had engaged a different actuarial firm, Watson Wyatt Worldwide ("Watson"), to represent RPI "with respect to the spin-off of assets from the [RPI] plans to the OCI plans."[14] Watson thus assumed responsibility for the final calculations of the value of assets to be transferred from the old RPI plans to the new OCI plans. The district court noted that

> [o]n or about March 26, 1996, defendant gave notice to the Internal Revenue Service that it had appointed a new actuary, Watson Wyatt Worldwide, and was filing new actuarial statements of valuation for plans 1674 and 1679. Watson Wyatt Worldwide issued its report on asset transfer, calculating the amount to be transferred from defendant's retirement trust to OCI's pension plans as of March 28, 1996 to be $13,070,205.[15]

On March 28, 1996, RPI instructed the trustee of its pension plans to transfer $13,070,205 to OCI's plans. On March 29, 1996, RPI filed notices of reportable events with the PBGC, reporting the transfer of pension liabilities and benefits. On May 15, 1996, Coopers, this time acting as actuaries for OCI, independently recalculated the ABO and PBO figures and agreed that Watson's conclusions accurately reflected the plans' formulae and agreed-to

---

[14]The representation by counsel for RPI at oral argument that this eleventh-hour switch was prompted solely by differences in discount rate interpretation belies the fact that Coopers and Watson used precisely the same rate of interest in their respective calculations. Pretext inevitably raises the specter of mendacity.

[15]See Union Pac. Resources Group, 45 F. Supp.2d at 550.

actuarial assumptions.  None of this information was furnished currently to UPRG.

The other shoe finally hit the floor when, approximately one year after the transfer, OCI notified UPRG that it must make additional contributions to the new OCI plans in the amount of $3-4 million —— not so coincidentally, 49 percent of the difference between (1) ABO and (2) the market value of RPI's plans' assets attributable to the Green River employees as of February 29, 1996. Stunned by this wholly unexpected assessment, UPRG immediately contacted RPI, OCI, and Coopers to identify the reason for the shortfall.  With the assistance of OCI and Coopers, UPRG was able to determine that the current level of funding of the new plans was, in the aggregate, approximately $4.6 million below the actual funding levels of the old RPI plans, as of closing, of which UPRG's 49 percent came to roughly $2.3 million.  (Variation between closing date levels and those over a year later were likely attributable at least in part to the performances of the plans' portfolios, the fluctuations in employment and benefits, and employer contributions made during the period of more than one year following closing.) UPRG also learned for the first time that RPI had caused its own plans to retain, untransferred, 100 percent of the amount by which the market value of the portion of pension plan assets allocable to the Green River employees exceeded such share of ABO at the time those employees were transferred to the new OCI

13

plans on February 29, 1996.

UPRG thus contends that when the dust finally settled on this complex transaction, the wins, losses, and ties chalked up by the three players as a result of the pension-plan maneuvering was as follows:

> ! OCI essentially broke even: It received as a credit the $3.8 million purchase-price reduction (51 percent of the difference between ABO and PBO), which offset its predicted liability for 51 percent of the anticipated funding deficiency in its own new plans, a deficiency directly attributable to RPI's under-transfer of plan assets.

> ! RPI won: It ended up with an excess of assets over the pre-closing funding levels in its own pension plans, an excess directly attributable to RPI's causing its own plans to retain 100 percent of the differential between ABO and actual value of plan assets allocable to the transferred Green River employees,[16] while "paying" for that 100 percent retainage with a credit to OCI of only 51 percent of the ABO/PBO differential, thereby indirectly pocketing UPRG's 49 percent of the excess funding for which UPRG had paid over the years as RPI's partner;

> ! UPRG lost: It ended up with a multi-million-dollar liability for its 49 percent share of the funding shortfall in the new OCI plans, a liability directly attributable to RPI's retention in its plans of 100% of the excess of asset value over ABO without providing an offsetting benefit to UPRG for 49 percent of its share of that excess.

In essence, UPRG's position is that, as a result of the acts of

_____

[16]Assuming a straight, pro-rata ratio of asset value to ABO, Plan 1674 was funded 10.693 percent in excess of ABO before the transfer, and Plan 1679 was funded 19.06 percent in excess of ABO.

RPI, it was required to pay the same 49 percent twice, first in contributing that percentage through the Wyoming Partnership to fund the old plans for the participating employees of Green River, and again, a year after closing, when notified by OCI of the need to remit 49 percent of the then-current shortfall in the new plans' level of funding.

In 1998, UPRG filed suit against RPI, alleging breach of contract, conversion, negligent misrepresentation, fraud, and securities fraud in connection with UPRG's relinquishment of its ROFRs and RPI's subsequent transfer of its partnership interest to OCI.  RPI moved for summary judgment on all claims.  The district court granted RPI's motion for summary judgment and dismissed all of UPRG's claims with prejudice.  This appeal followed.

II.

Analysis

A.  <u>Standard of Review</u>

We review a grant of summary judgment <u>de novo</u>, applying the same standard as the district court.[17]  A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[18]  An issue is material if its resolution

---

[17]<u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

[18]Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

could affect the outcome of the action.[19]  In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[20]

The standard for summary judgment mirrors that for judgment as a matter of law.[21]  Thus, the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[22]  In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached.[23]

B.  UPRG's Fraud Claim:  Voluntary Partial Disclosure

Applying this standard of review to the instant case, we conclude that RPI was not entitled to summary judgment on UPRG's fraud claim.  We disagree with the district court's holding that UPRG had not put forward sufficient evidence to support an essential element of its claim; specifically, summary judgment

---

[19]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[20]See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

[21]Celotex Corp., 477 U.S. at 323.

[22]Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135, 150 (2000) (citation omitted).

[23]Id. at 151 (citations omitted).

16

evidence that RPI was under a duty as a matter of law to make full disclosure to UPRG and failed to do so. The district court appears to have proceeded on the legal assumption that a duty of disclosure arises only when one must correct one's own prior false or misleading statements. But a well-established tenet of tort law proclaims that one who voluntarily elects to make a partial disclosure is deemed to have assumed a duty to tell the whole truth, i.e., to make full disclosure, even though the speaker was under no duty to make the partial disclosure in the first place.[24]

UPRG asserts that when RPI elected to make partial disclosures about the stock sale over and above the disclosures that it was required to make by the partnership agreement, RPI assumed the duty of full disclosure. In so doing, UPRG continues, RPI obligated itself to make known the whole truth, i.e., all material facts, about the transaction with OCI. More particularly, UPRG contends that RPI committed fraud by failing to disclose its scheme to retain in its own pension trusts all partnership-funded plan assets in excess of ABO, transferring to OCI's new plans only enough asset value to equal ABO, a figure millions of dollars below the funding level for the Green River employees in the old plans.[25] UPRG

---

[24]See Restatement (Second) of Torts § 551(2)(b) (1976), with which Texas law is in accord. See, e.g., Boggan v. Data Sys. Network Corp., 969 F.2d 149, 154 (5th Cir. 1992) (citation omitted); Southeastern Financial Corp. v. United Merchants & Mfrs., Inc., 701 F.2d 565, 566 (5th Cir. 1983) (citation omitted).

[25]RPI's protestations that it "took no money" from its pension trust except for the amount transferred to OCI are fatuous. UPRG

insists that full disclosure was necessary to correct the false and misleading impression that "there was nothing about the proposed transaction that would harm [UPRG],"[26] an impression created ── deliberately, according to UPRG ── by RPI's voluntary partial disclosures that (1) after the transfer, the new pension plans would be "substantially similar" to the old ones, (2) funds equal to only the ABO amount of the old RPI pension plans would be transferred to OCI for the new plans, and (3) OCI would receive a purchase price credit that, unbeknownst to UPRG, would "cover" OCI's 51 percent share ── but not UPRG's 49 percent share ──  of the resulting differential between ABO and the actual funding level for Green River employees participating in the old plans immediately before the transfer.

At the heart of UPRG's fraud claim is the contention that it was led ── or misled ── by RPI's partial disclosure and

---

does not claim that RPI somehow removed assets held in trust for pension plan participants and their beneficiaries.  Rather, UPRG argues that RPI, as plan administrator, fraudulently caused funds previously contributed by the Wyoming partnership — only 51 percent of which had been contributed by RPI, the remaining 49 percent having been contributed by UPRG — to be retained in RPI's own pension plans.  After the stock sale to OCI, RPI's pension plans for its own non-Green River employees who continued to be participants in those plans were overfunded; RPI therefore benefitted by avoiding the need to make routine contributions to meet its pension obligations to its own employees; or, if the plans remain overfunded, RPI can take the excess if the plans are ever terminated.

[26]According to the affidavit of Gilbert H. Kuhnhausen, Director of Minerals with UPRG and Vice President with Big Island, RPI offered these oral assurances to UPRG during late October and November of 1995.

18

representation of "openness" to believe that the actual funding level of the plans was <u>at or below</u> ABO, rather than several millions of dollars <u>above</u> ABO as was eventually discovered — more than a year after closing — to have been the case.

Here's the significance: In its selective disclosure, RPI let its partner, UPRG, know that (1) assets worth only the low-level ABO funding would be transferred from RPI's plans to OCI's new plans, and (2) the new plans for the transferred Green River employees would have to be "substantially similar" to the old plans, (mis)leading any reasonable person in UPRG's partially informed position to conclude that the old plans must be funded at (or below) ABO. Then, as though that were not sufficient to lull UPRG to such a deduction, its partner of five years standing steadfastly contended that such was in fact the case, that the funding level of the old plans was at or below ABO. Indeed, all the way through oral argument before this panel and in post-argument submittals as well, RPI insisted that such was the case even though RPI was in the unique position among all parties at interest to know the market value of its plans' portfolios and the ABO of those plans.[27] That, at closing, the old plans' assets were

_____

[27]The dissent's claim that "there is no evidence that RPI ever failed to furnish UPRG any information which UPRG requested respecting the value of the assets of the plans in reference to ABO or PBO" is wide of the mark: RPI has (misleadingly) insisted throughout this litigation that the actual value of the plan assets was at all relevant times at or even below ABO. We reiterate that ABO and PBO are not actual funding figures but actuarial terms that describe two different levels at which the liability of pension

19

worth many millions more than ABO was a well-kept and well-protected secret which inured to RPI's benefit and UPRG's detriment and which UPRG cannot reasonably be held at fault for failing to ferret out in the thirty days it had in which to do so. We conclude that there is sufficient summary evidence to establish a genuine issue of material fact —— whether the plans, which were in the exclusive control of RPI, were funded substantially above the ABO level that RPI had disclosed to be the transfer level —— to require the fraud claim to go to the fact finders.

We begin with basic legal principles of the Texas tort law of fraud.[28] Texas defines fraud as "a material representation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury."[29] Failure to disclose a material fact is fraudulent only if the

---

plans can be calculated. Thus, even a plan _funded_ at PBO will not necessarily (or likely) have assets in that amount; accordingly, knowledge of the plans' ABO or PBO would not have alerted RPI to the relevant discrepancy between ABO and the actual market value of the plans at closing, and it is this differential —— not the difference between ABO and PBO —— that lies at the heart of UPRG's claim.

[28]We assume, as did the parties and the district court, that UPRG's common-law fraud claim arises under Texas state law.

[29]Formosa Plastics Corp. v. Presidio Engineers and Contractors, 960 S.W.2d 41, 47 (Tex. 1998)(internal quotation marks and citation omitted).

20

defendant has a duty to disclose that fact.[30] A duty to speak can arise by operation of law or by agreement of the parties.[31]

A duty to speak arises by operation of law when (1) a confidential or fiduciary relationship exists between the parties; or (2) one party learns later that his previous affirmative statement was false or misleading; or (3) one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth; or (4) one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, i.e., all material facts, lest his partial disclosure convey a false impression.[32] Here, when we view the facts and all reasonable inferences from the summary judgment evidence favorably to UPRG as the non-movant, we conclude that RPI assumed the affirmative duty to make full disclosure when it volunteered some (but not all) material information about the transaction. It thereby obligated itself to speak the whole truth; it could not remain silent after merely making partial disclosures that conveyed

---

[30]Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986).

[31]Trustees of the Northwest Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski, 27 F.3d 153, 157 (5th Cir. 1994).

[32]World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 670 (Tex. App.–Forth Worth 1998, pet. denied); see also Trustees, 27 F.3d at 157.

21

a false impression.[33]

As we have already noted, the partnership agreement obligated RPI to disclose nothing more than (1) its intention to transfer an interest in the partnership and the amount of the interest that it intended to transfer — here, 100 percent, (2) the identity of the proposed transferee — here, OCI, and (3) the purchase price — here, $150 million in cash (subject to adjustments). The partnership agreement also obligated RPI to provide UPRG with a "photostatic copy" of a written "purchase offer"; however, all that the partnership agreement required the purchase offer to include was the purchase price. RPI nevertheless opted to disclose not

---

[33]UPRG also argues that a confidential or fiduciary relationship existed between the parties that created a duty to disclose. RPI counters that, as it was not a party to the partnership agreement, any dealings between RPI and UPRG must be characterized as arms-length. In support of its contention, RPI notes that UPRG does not advance any claims alleging breach of fiduciary duty. Although our holding does not depend on the existence of a relationship of trust or confidence between RPI and UPRG, we note that a strict fiduciary relationship is not required for a duty to disclose to arise. See Trustees, 27 F.3d at 157 n.16. Rather, the relationship must only be one of "trust and confidence." See Lang v. Lee, 777 S.W.2d 158, 164 (Tex.Civ.App.–Dallas 1989, no writ).

More to the point, when examining claims of fraud, courts can ignore technicalities such as multiple layers of business entities, and look directly to the true parties in interest and control, such as parent corporations owning and controlling — and directly acting through — their wholly owned subsidiaries. Here, Holding was obviously created as RPI's alter ego for the Wyoming partnership and served as such; the same could be said of Big Island and UPRG. In particular, the summary judgment evidence shows that RPI made no bones about being the de facto managing partner of the Wyoming partnership even though Holding was technically the named partner. RPI cannot here hide behind such legal niceties and claim to be a stranger to the Wyoming partnership.

22

merely the purchase price and the identity of the purchaser, but, more substantially, the myriad terms and conditions of a complex "Stock Purchase Agreement" that extended over 100 pages.

Moreover, RPI went out of its way to make UPRG aware that, by sharing the full purchase agreement with it, RPI had voluntarily supplied information beyond its contractual obligation. In a letter responding to UPRG's first request for more information about the proposed transfer, the president of RPI stated,

> we are forwarding the additional documents you requested <u>even though the information you received on October 23 is sufficient for formal notification of a definitive offer</u>. Because we believe these documents will not impact your analysis of Union Pacific's first refusal rights, we add the following points. Section 10.4 does not require that we deliver the Stock Purchase Agreement since it specifies only that we have to notify you of the interest to be transferred and the identity of the purchaser. We have done all of this formally on October 23 and <u>provided additional perspective and information in the spirit of openness</u> (emphasis added).

Clearly RPI elected unilaterally to go beyond the minimum formal disclosures required by the partnership agreement; just as clearly, when it did so, RPI assumed the affirmative duty to disclose the whole truth, i.e., all material facts, about the proposed transaction. A trier of fact could reasonably conclude that RPI disclosed significantly more than the minimum required by law to trigger this duty when it chose to reveal some, but less than all, material facts about the proposed sale to OCI.

23

A fact finder could also conclude that RPI intentionally lulled UPRG into a false sense of security by embellishing its charade with a constant extolling of the "spirit of openness" in which, RPI intimated, it had always conducted its dealings with UPRG. Further, a trier of fact could find that the false sense of security that RPI engendered in UPRG by this ploy was reinforced by the several instances when RPI's cajolery was closely preceded or followed by exhortations for UPRG to make a decision on the ROFRs within the 30-day period specified in the contracts (despite RPI's having omitted several schedules that were supposed to be attached to the purchase agreement).

Inasmuch as RPI was under an affirmative duty of full disclosure to UPRG as a matter of law, a trier of fact could make the ultimate finding that RPI committed fraud against UPRG by making partial disclosures that conveyed a false impression; specifically, that the funding levels of the pension plans would be "substantially similar" to those of the old RPI plans, all the while lulling UPRG into sufficient complacency and trust that it would not conduct a more extensive independent search. RPI invoked "spirit of openness" as a synonym for "full disclosure" on more than one occasion when corresponding with UPRG. Surely, RPI cannot now disclaim its duty to UPRG to disclose the whole truth of the transaction, especially when RPI contemporaneously accompanied its "sweet talk" to UPRG with reminders that UPRG had only 30 days in which to decide whether to exercise its ROFRs, despite RPI's

24

omission of schedules and exhibits from the copy of the purchase agreement that it voluntarily sent to UPRG.

C. RPI's Affirmative Defenses

    1. UPRG Knew What It Did Not Know

RPI counters by asserting that even if it were under a duty of full disclosure, it fulfilled that obligation by disclosing to UPRG, through the purchase agreement, that (1) OCI would receive a reduction in the purchase price equivalent to 51 percent of any difference between the plans' ABOs and PBOs, and (2) plan assets worth only ABO would be transferred to OCI. Therefore, claims RPI, the only piece of information ostensibly "hidden" from UPRG was the precise amount of the difference between ABO or PBO. It follows, according to RPI, that because UPRG "knew that it did not know" this figure, RPI's failure to disclose it, in the absence of an explicit request to do so, cannot constitute fraud. In sum, RPI argues that no material fact was "hidden" from UPRG because it "knew what it didn't know" —— the difference between the ABO and PBO valuations of the pension plans —— and never explicitly requested that information. We disagree.

First, this is a quintessential red herring. Neither the fact that the purchase price would be adjusted for the difference between ABO and PBO, nor the quantum of that differential, is what is at issue. What is at issue, and what RPI appears to be intentionally obfuscating by harping on the ABO/PBO purchase-price credit, is not the differential between ABO and PBO but the

25

differential between ABO and the fair market value of the plan assets, i.e., the value of the plan assets over and above ABO.[34] That difference is the quantum that UPRG insists RPI surreptitiously caused its pension plans not to transfer to the OCI plans[35]; that is the "hidden ball" alleged by UPRG.

The undisclosed existence of a multi-million-dollar differential between ABO and the plans' actual funding levels is what allegedly forced UPRG to pay twice to fund the plan; more precisely, to pay 49 percent of that differential twice. RPI knew, at all times from and after October 19, 1995, that (1) the value of the plan assets always exceeded ABO, and (2) at most times the excess of PBO over ABO would likely be greater than the excess of actual funding over ABO. Thus the 51 percent of the ABO/PBO differential that RPI "paid" to OCI in the form of a purchase-price

---

[34]The dissent's contention that "[a]ll UPRG didn't know was the amount by which the PBO level would exceed the ABO level" is thus beside the point: The critical fact that UPRG did not know — and without information from RPI could not know — was the difference between the actual market value of the plan assets and ABO. It is this difference which is the gravamen of UPRG's fraud claim, and that makes the PBO/ABO discussion a "red herring." See supra n.27.

[35]At oral argument before this court, counsel for RPI insisted that the ABO/PBO purchase price adjustment was "just part of the negotiation." His representation is undercut by the fact that prior to the drafting of the purchase agreement, Coopers advised RPI that if it should ever assume an obligation to transfer plan assets at the higher PBO level, the resulting underfunding in its own pension fund accounts "could be reflected as an adjustment to the purchase price." More importantly, this information tends to show that RPI, despite all of its diversionary invocations of ABO and PBO, was and is quite aware that actual funding of the plans, rather than either ABO or PBO, is the critical figure vis-à-vis UPRG's fraud claim.

26

reduction assured OCI of an adequate financial offset to the pension plan liability that it was certain to incur at closing as accurately forecast by the actuaries; specifically, liability for 51 percent of the shortfall between the value of assets transferred at ABO and the actual level of plan funding.

The thrust of UPRG's fraud claim is that RPI made no concomitant provision for such an offsetting credit to cover UPRG's 49 percent share of the employer's liability for the new plans' funding shortfall. Even more central to that fraud claim is the allegation that, given RPI's exclusive sponsorship and administration of the old plans, there was no hint that anything was amiss and no way for UPRG to discover what RPI was doing, at least not within the 30-day ROFR window, short of rejecting RPI's "spirit of openness" and instituting litigation to compel disclosure through protracted discovery. Significantly, RPI (and OCI, for that matter) had to have been aware that, after closing, an additional infusion of assets would be needed to bring the new plans up to the pre-closing funding level of the old ones: That would be required to ensure that the Department of Labor, the IRS, and the PBGC would be satisfied that the Green River employees had been transferred to pension plans that were essentially identical to the old ones —— in level of funding as well as in substantive provisions.

RPI's argument also fails to confront the fact that even if UPRG had asked RPI for the exact amount of the ABO/PBO differential

27

in the context of the purchase price adjustment, disclosure of that figure still would not have alerted UPRG to either the existence or extent of the amount by which the actual value of the pension plan assets exceeded ABO, the latter being the value of assets actually transferred to OCI.  Not only is there no correlation between these two differentials, but it is also undisputed that only RPI, as the sole sponsor of the plans, had control over and access to plan records and reports that would have made the gap between actual funding and ABO apparent or even determinable.[36]  As UPRG correctly notes, it is hornbook law that a fraud feasor cannot defeat a claim for damages by complaining that the defrauded party might have discovered the truth by exercising more diligence.[37]

RPI's heavy reliance on <u>Koch Indus., Inc. v. Sun Co.</u>,[38] which involved breach of contract and not fraud, is thus misplaced.  In <u>Koch</u>, we held that specific performance is not available as a remedy for breach of an ROFR agreement when the seller has made reasonable disclosure of an offer's terms, but the rightholder has

---

[36]Given the short, 30-day fuse on the ROFRs and the minimal disclosure requirements of the partnership agreement, it is questionable whether UPRG would have been furnished that information even if it had requested it. RPI's apparent culture of deceptively selective disclosure seems to have infected its appellate counsel who, in oral argument and in post-argument submittals, insisted that the plans' funding levels were barely at or even <u>below</u> ABO at all significant times, a representation eventually shown to have been false.

[37]<u>Southeastern Finanacial Corp.</u>, 701 F.2d at 567.

[38]918 F.2d 1203 (5th Cir. 1990).

failed to undertake a reasonable investigation of any terms unclear to him.[39]  The claim in <u>Koch</u>, that particular terms in the offer were <u>unclear</u>, thus sounded in contract; the claim in this case, that UPRG fraudulently <u>concealed</u> key information about the proposed transaction, sounds in tort.  RPI's contention that UPRG was somehow obligated to ferret out, in 30 days, each and every potentially damaging fact somehow alluded to in a 113-page document that RPI had voluntarily provided to UPRG "in the spirit of openness" thus rings hollow, to say the least.[40]

Finding no support for its novel "due diligence" defense in binding precedent, RPI reaches out to the Tenth Circuit case of <u>Jensen v. Kimble</u> for the proposition that when a fraud plaintiff "knew what he didn't know," such knowledge belies a claim of fraud.[41]  But, when the plaintiff stock seller in <u>Jensen</u> specifically asked the defendant purchaser to reveal the names of the other parties involved in the transaction, the purchaser informed the plaintiff <u>precisely</u> what information he was <u>refusing</u>

---

[39]<u>Id.</u> at 1212.

[40]We also note that RPI and UPRG were, at a bare minimum, "coadventurers, subject to fiduciary duties akin to those of partners."  <u>See</u> <u>Meinhard v. Salmon</u>, 164 N.E. 545, 546 (N.Y. 1928). When a relationship of this kind exists, the law does not exact diligence on the part of the defrauded party as prompt and as searching as that required into the conduct of a stranger.  <u>See</u> <u>Lang</u>, 777 S.W.2d at 163-64.

[41]1 F.3d 1073, 1078 (10th Cir. 1993).

to disclose.[42]  <u>Jensen</u> is thus far different from the case at bar, in which UPRG alleges — and supports with summary judgment evidence — that RPI selectively volunteered information only in part, all the while deceptively proclaiming "openness" so as to create the illusion of full disclosure.

Finally, in <u>Jensen</u>, the defendant's omissions were not misleading with regard to any of the purchaser's other statements.[43] That is not so in the instant case, in which UPRG alleges that RPI's material omissions aided and abetted its partial disclosures by misleading UPRG about crucial aspects of the transaction.  If UPRG can prove this by a preponderance of the evidence, it will have established the existence of a stereotypical primrose path down which it was cunningly led by RPI's (1) partial disclosures, (2) repeated reminders about the 30-day ROFR deadline, (3) omission of key schedules and exhibits from the purchase agreement, and (4) assurances of "openness."

2. <u>The Tort/Contract Distinction</u>

As an alternative defense, RPI argues that UPRG's fraud claim is barred by the general rule that tort actions are not cognizable in a suit on a contract.[44]  RPI maintains that its conduct would not give rise to liability unless such acts breached its contractual

---

[42]<u>Id.</u>

[43]<u>Id.</u>

[44]<u>See</u> <u>Southwestern Bell Telephone Co. v. DeLanney</u>, 809 S.W.2d 493, 494 (Tex. 1991).

agreements with UPRG.

The flaw in RPI's argument is that it is based on the false premise that its obligation to disclose information about the prospective sale to OCI arose <u>solely</u> from the ROFR requirements of the agreements. To the contrary, as we have already noted, RPI's duty of full disclosure arose from its voluntary partial disclosures of information beyond that required by the partnership agreement, not to mention RPI's incomplete responses to the inquiries that UPRG did make and RPI's own insistence that it was making the additional disclosures in the "spirit of openness." In conducting itself that way, RPI assumed an obligation to make known to UPRG whatever further information might be necessary to correct any false impressions conveyed by RPI's partial disclosures.

Whether RPI met its contractual obligations under the ROFR agreements is irrelevant because its duty to disclose arose <u>independently</u> of those agreements. As even RPI must acknowledge, the law makes clear that if particular conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim sounds in tort.[45]

It is true that RPI's initial obligation to make contractually

---

[45]<u>See</u> <u>DeLanney</u>, 809 S.W.2d at 494. Whether the Texas Supreme Court's subsequent holding in <u>Formosa</u> that a fraudulent inducement claim can be brought in addition to a breach of contract claim applies to all fraud claims or only to claims of fraudulent inducement is thus irrelevant, because <u>DeLanney</u>'s stricter "independent duty" requirement is satisfied here in either case. <u>See</u> <u>Formosa</u>, 960 S.W.2d at 47.

specified disclosures —— its intention to transfer its partnership interest, the identity of the purchaser, and the purchase price —— did come from the agreement between the parties, so that any claim arising out of alleged violations of the ROFRs would indeed sound in contract. But when, as here, the fraud claim is based on an obligation that arose, by operation of law, out of one party's voluntary disclosure of information beyond that required by its agreements with the other party, the general rule against fraud claims based on contractual obligations is no barrier to liability.

### III.

*Conclusion*

We affirm the district court's summary judgment to the extent it dismissed UPRG's claims grounded in conversion, securities fraud, and negligent misrepresentation. For the reasons discussed above, however, we reverse the district court to the extent that it dismissed UPRG's fraud claim, and we remand that claim for further proceedings consistent with this opinion. In so doing we stress that we imply nothing about the likely outcome of a trial on this claim, only that the theory of UPRG's fraud claim and the summary judgment evidence proffered in support of that theory, viewed in the light most favorable to UPRG as the non-movant, are sufficient to defeat summary judgment and require a determination by the trier of fact.

AFFIRMED in part; REVERSED in part; and REMANDED.

GARWOOD, Circuit Judge, dissenting.


I concur in the majority opinion to the extent that it affirms the dismissal of UPRG's conversion, securities fraud and negligent misrepresentation claims. However, I respectfully dissent from the reversal and remand of the judgment dismissing UPRG's fraud claim.

The majority, correctly, does not contend that there is any evidence that RPI made any false or misleading factual representation to UPRG or that RPI failed to disclose to UPRG any fact necessary in order to make the facts which it did represent to UPRG not misleading. Rather, the majority asserts that there is evidence that RPI committed fraud on UPRG by breaching a duty to make full disclosure to UPRG. I disagree.

It has always been unclear to me just what UPRG claims should have been but was not disclosed. UPRG's ultimate complaint is that, about a year after RPI's sale to OCI, UPRG was called upon by OCI to come up with UPRG's forty-nine percent share of the then some 4.6 million dollar difference between the actual funding of the new pension plans for partnership employees and the appropriate PBO level for those plans. This wholly resulted from the facts–disclosed by RPI and known to UPRG–that RPI was transferring from its pension plans to the OCI plans assets sufficient only to meet ABO levels (not the higher PBO levels) for the transferring

employees, that under the RPI plans' "contributions are intended to provide for benefits attributable for service rendered to date, as well as for those expected to be earned in the future" (i.e., PBO), that OCI was going to continue the business (which would render PBO funding appropriate), agreed to have the transferring employees covered by "substantially similar" plans as they were before, and assumed liability for those employees' accrued benefits as they thereafter became due, and that OCI would receive a credit on its purchase price obligation equal to fifty-one percent (RPI's partnership percentage) of the difference between the ABO and PBO funding levels for the plans for the transferred employees. RPI disclosed and UPRG knew all these facts. Moreover, UPRG plainly knew, and certainly RPI could reasonably assume UPRG knew, that the PBO level would exceed the ABO level. All UPRG didn't know was *the amount by which* the PBO level would exceed the ABO level, and clearly UPRG knew it didn't know this. Nothing RPI said can be construed either as any sort of implied representation as to the extent of this PBO/ABO difference or as any sort of implied characterization of the extent of that difference as being minor or the like.

The majority labels all this as a "quintessential red herring." This characterization is hard to understand, as the extent of the PBO/ABO difference is the entire reason for and the measure of the "loss" of which UPRG complains. The majority claims

35

that "what is at issue" is that at the time of the RPI-OCI agreement, and when RPI made disclosures to UPRG respecting it, the value of the assets of the plans was substantially above ABO, and that this was not disclosed to UPRG. Nothing, however, is pointed to as constituting any even implied representation by RPI to UPRG that either plan was then *not* funded (or did not have assets with a then market value) materially above ABO. Nor is there any evidence that UPRG believed, or construed anything RPI had said as even impliedly representing, that the plans were funded (or that their assets had a then market value) only at or below, or not materially above, ABO. To the contrary, the partnership audited financial statements, furnished annually to UPRG state respecting these plans that "contributions are intended to provide benefits attributable to services rendered to date, as well as for those expected to be earned in the future." At oral argument, counsel for UPRG read this language and characterized it as stating "That's PBO" and as constituting evidence that the plans *were* then funded "above ABO."

I also note that there is no evidence that RPI ever failed to furnish UPRG any information which UPRG requested respecting the value of the assets of the plans in reference to ABO or PBO, or the extent of the difference between ABO and PBO funding of the plans.

Apropos here are the remarks of the Tenth Circuit in *Jensen v. Kimble*, 1 F.3d 1073 (10th Cir. 1993), upholding summary judgment

36

for the defendant Kimble in a securities fraud case, viz:

> ". . . [B]y virtue of the disclosures that Kimble did make, Jensen knew what he didn't know.  Under these circumstances, even assuming arguendo that a special relationship of trust existed between Jensen and Kimble, we do not believe it can be said that Kimble's omissions misled Jensen with respect to any of Kimble's other remarks.  Accordingly, even viewing the evidence in the light most favorable to the plaintiffs, we conclude that Kimble's omissions were neither manipulative nor deceptive within the meaning of Rule 10b-5 and thus are not actionable under this rule."  *Id*. at 1078.

If the concept of "fraud" is so protean and malleable as to allow UPRG recovery on this record, then the value of written contracts between even the most sophisticated businesses is substantially undercut and we have given an unfortunate boost to the rule of ad hocracy and a concomitant disservice to the rule of law.