# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-20011

United States Court of Appeals
Fifth Circuit

**FILED**
April 6, 2020

Lyle W. Cayce
Clerk

OJSC UKRNAFTA,

Plaintiff-Appellant

v.

CARPATSKY PETROLEUM CORPORATION,

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, SMITH, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Arbitration is supposed to keep disputes out of court and "increase[] the speed of dispute resolution." *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011). It does not always turn out that way. Despite the parties' initial recourse to arbitration, this international oil-and-gas dispute has reached the courts of three countries: Sweden, Ukraine, and the United States. And this American chapter of the saga is still pending a decade after the private tribunal awarded $147 million.

This appeal challenges an order confirming that award. The principal issue is whether an allegedly undisclosed change in the place of incorporation of one party from Texas to Delaware—and the continued use of a Texas corporate seal by that party's aptly named president, Mr. Texas—means there

No. 19-20011

was never an agreement to arbitrate. We reject that defense as well as the others asserted and affirm the confirmation order. We also conclude that the arbitration precludes the claims the losing party still wants to pursue.

I.

This case has its origins more than a quarter century ago in the breakup of the Soviet Union. Foreign investment, especially in energy, flooded into former Soviet Republics. Carpatsky Petroleum Corporation, at the time a Texas company, saw an opportunity in Ukraine. In 1994, it agreed to develop petroleum with that country's state oil-and-gas enterprise, OJSC Ukrnafta. Ukrnafta is a portmanteau of Ukraine and the Ukrainian word for oil.

One year later, the parties add the "and-gas" to their dealings. They signed a joint activity agreement (JAA) to develop a gas condensate field in Ukraine. Ukrainian law would govern that agreement, and an international commercial arbitration tribunal in Kiev would resolve any disputes.

In July 1996, Carpatsky merged into a newly incorporated Delaware company of the same name.[1] According to the later testimony of Leslie Texas, the president of both companies, "nothing changed" but the corporate structure. He also testified that he told a Ukrnafta official about the change, but Carpatsky did not formally notify Ukrnafta. Indeed, an October 1996 amendment to the JAA still states that Carpatsky was registered in Texas, and Mr. Texas accompanied his signature with the Carpatsky-Texas seal.[2]

---

[1] This opinion uses the terms "Carpatsky-Texas" and "Carpatsky-Delaware" when necessary to distinguish the two entities. But the corporations never had the state identifier in their names.

[2] This seal does not contain the word "Texas." And Texas does not issue corporate seals or require businesses to have them. *See* TEXAS SECRETARY OF STATE, *Formation of Texas Entities FAQs* ("Where Can I Get a Corporate Seal, Stock Certificates, and a Minute Book?"), https://www.sos.state.tx.us/corp/formationfaqs.shtml. But the seal includes an identification number tied to the Texas incorporation, which is likely why the parties agree this is a "Texas seal."

Two years later, Carpatsky and Ukrnafta again amended the JAA. Among other things, this 1998 amendment changed the arbitration venue to the neutral location of Stockholm.  Mr. Texas again stamped the Carpatsky-Texas seal next to his signature on the agreement.

About a decade after the parties' relationship began, it started to go bad. Over the years, Carpatsky had failed to contribute half of the venture's capital. To compensate, Ukrnafta increased its own contributions and, as a result, its ownership interest.  In 2004, however, Carpatsky wanted to "top up" its investment.  It asserted a contractual right to make up for missed contributions and restore its 50% interest.  Ukrnafta refused the request and declared itself the "sole owner" of projects it undertook without Carpatsky's input.

Litigation followed.  In 1997, Carpatsky filed an arbitration request in Stockholm.  It alleged that Ukrnafta breached the JAA by rejecting Carpatsky's request to restore its 50% interest, engaging in exploration and development without Carpatsky, and withholding information.  The request identifies Carpatsky as a Delaware company.  In its answer, Ukrnafta "agreed to proceed with the arbitration."  When Carpatsky filed its statement of claim, it again correctly described itself as a Delaware company.  In its statement of defense filed the next month, Ukrnafta did not challenge jurisdiction.

Ukrnafta changed course in December 2008, more than a year after the arbitration began and more than six months after the Statement of Claim was filed.  For the first time, Ukrnafta disputed jurisdiction.  It alleged it had just discovered that Carpatsky had changed corporate entities and argued there was no arbitration agreement with Carpatsky-Delaware.

 To further pursue the change-of-domicile argument, Ukrnafta soon opened the American front in this litigation.  In early 2009, it sued Carpatsky in Texas state court, alleging that every amendment after July 1996 was "null

and void" because those amendments were signed by the defunct Texas corporation. Ukrnafta asserted claims of negligent misrepresentation, fraud, misappropriation of trade secrets, tortious interference with existing contracts, and unjust enrichment. Carpatsky removed the case to federal court, asserting that the suit related to an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention). 9 U.S.C. § 205, 21 U.S.T. 2517.

Ukrnafta sought to enjoin Carpatsky from using trade secrets that, in Ukrnafta's view, the Delaware entity never had a right to. Carpatsky sought to stay the American litigation pending the arbitration. Despite Ukrnafta's claim that the amendment providing for arbitration in Sweden never came into existence, the district court stayed the lawsuit and denied Ukrnafta's motion. After it failed to obtain injunctive relief, Ukrnafta filed a motion to remand to state court. The court struck the remand motion because of the stay. Ukrnafta never reurged it.

Back in Stockholm, the arbitral tribunal determined that it had jurisdiction because Ukrnafta's objection was "untimely" and Ukrnafta had arbitrated "without reservation" despite having documents—like the arbitration request—showing that Carpatsky was a Delaware company.

Around this time, Ukrnafta expanded the litigation to European courts. It sued Carpatsky in Sweden and Ukraine. It took just two months for the Ukrainian court to render its verdict: all agreements after Carpatsky-Texas became Carpatsky-Delaware were "non-executed." That meant there was never an agreement to arbitrate in Stockholm. Ukraine's appellate courts later agreed.

The Ukrainian ruling did not deter the Swedish arbitration tribunal. In September 2010, it awarded Carpatsky close to $147 million and declared the JAA terminated based on Ukrnafta's breach. In doing so, the tribunal held

that Carpatsky-Delaware was a party to the JAA.  Applying Delaware law, it concluded that Carpatsky-Delaware succeeded Carpatsky-Texas's rights, so it "acquired the legal capacity to enter into the Restated JAA" and amendments. Endowed with that authority, Mr. Texas signed the JAA and amendments. That was enough to bind the company.

With its arbitration win in hand, Carpatsky tried to reopen the U.S. litigation.  It asked the federal court to lift the stay and confirm the award. The district court denied the motion without prejudice, keeping the stay in place pending the lawsuit Ukrnafta had filed in Sweden.

The Swedish courts ruled against Ukrnafta.  The trial court held that the arbitral tribunal had jurisdiction.  The court of appeals affirmed.  It later rejected Ukrnafta's appeal of the arbitration award.

At long last the European litigation had ended, so the district court reopened this lawsuit in 2017.  It confirmed the arbitration award, rejecting numerous challenges Ukrnafta asserted.  The district court also granted summary judgment dismissing Ukrnafta's state-law claims on preclusion grounds.  Ukrnafta appeals both rulings.

II.

We first address whether the district court had removal jurisdiction. Ukrnafta contends it did not because the 1998 arbitration "agreement" never existed, as it was signed by the defunct Carpatsky-Texas.  As we will explain later, we disagree with that premise.  The 1998 amendment, which changed the location of any arbitration to Sweden, was entered into by "Carpatsky Petroleum Corporation, USA," with no mention of its being a Texas entity.

But the jurisdictional inquiry does not require us to decide whether an arbitration agreement will end up governing the lawsuit.  *Beiser v. Weyler*, 284 F.3d 665, 671–72 (5th Cir. 2002).  Removal is allowed whenever a defendant asserts a "nonfrivolous connection" to an international arbitration agreement.

No. 19-20011

*Certain Underwriters at Lloyd's v. Warrantech Corp.*, 461 F.3d 568, 575–76 (5th Cir. 2006). That low bar follows from the language of the removal statute. Removal is allowed "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205. "Relates to" is broad language. *Beiser*, 284 F.3d at 669. That is why we have described section 205 as "one of the broadest removal provisions . . . in the statute books." *Acosta v. Master Maint. & Constr., Inc.*, 452 F.3d 373, 377 (5th Cir. 2006). As long as there is a conceivable connection to an arbitration agreement, "the district court will have jurisdiction to decide the merits of that claim." *Beiser*, 284 F.3d at 671–72. Removal to federal court may thus be proper even when it turns out there is no arbitration agreement.[3] *See, e.g., Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316, 1322–27 (11th Cir. 2018) (holding removal was proper under *Beiser*'s conceivability standard but then concluding the parties had not signed the arbitration agreement as required by the Convention), *cert. granted sub nom GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 139 S. Ct. 2776 (2019).[4]

Section 205's separation of the jurisdictional and merits inquiries is no anomaly. The same dichotomy exists for federal question jurisdiction. That core Article III jurisdiction exists so long as the plaintiff alleges a nonfrivolous

---

[3] Ukrnafta ignores this jurisdiction/merits distinction in citing cases that address the difference between challenges to the existence and validity of arbitration agreements. *See Arnold v. HomeAway, Inc.*, 890 F.3d 546 (5th Cir. 2018); *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211 (5th Cir. 2003). In fact, those cases show that even though issues of formation and existence are governed by state law, federal courts still get to decide them because of their effect on the federal issue of arbitration. *See Arnold,* 890 F.3d at 550 ("Where the very existence of a contract containing the relevant arbitration agreement is called into question, the federal courts have authority and responsibility to decide the matter." (quotations omitted)).

[4] The question presented relates to the merits of the arbitration issue, not the federal court's section 205 jurisdiction. *See* Petition for Certiorari, Sup. Ct. No. 18-1048.

federal claim; the plaintiff need not, and often will not, succeed on the federal claim for a federal court to be able to decide it. *Beiser*, 284 F.3d at 670–71; *see also Arbaugh & Y&H Corp.*, 546 U.S. 500, 513 n.10 (2006) (explaining that federal jurisdiction exists whenever a plaintiff alleges a federal cause of action unless it is "wholly insubstantial and frivolous"). This rule reflects that jurisdiction must be determined at the outset of a case and that expertise on federal law is just as useful in weeding out claims as in recognizing them.

Carpatsky easily clears the low conceivability hurdle for jurisdiction. *Beiser*, 284 F.3d at 669 (recognizing that section 205 removal is allowed in "just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense"). Carpatsky alleged a connection to the 1998 arbitration clause that is far from being "completely absurd or impossible." *Id.* The removal notice alleges that Ukrnafta's claims relate to that agreement, which falls under the Convention. And it alleges that Carpatsky-Delaware is a party to that agreement.

Regardless of whether the arbitration agreement ends up applying, it is enough that the removal petition makes this nonfrivolous argument that it does. It is certainly conceivable from the face of the 1998 agreement, which names Carpatsky Petroleum Corporation USA as a signatory, that these parties are bound by the arbitration agreement—so much so that Ukrnafta did not see a problem with the Stockholm arbitration for more than a year. That conceivable connection is all that is required to invoke the expertise of the federal courts to decide these disputed questions relating to a federal treaty (the Convention).

### III.

Having established that the district court had jurisdiction to resolve this lawsuit, we now review its merits rulings. The big one is its confirmation of the $147 million arbitration award.

We first discuss the ground rules for our review of arbitration awards. The scope of federal court review depends on whether the United States has primary or secondary jurisdiction over the award. A country "in which, or under the [arbitration] law of which, [an] award was made" has primary jurisdiction. CONVENTION art. V(1)(e); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003) (*Karaha I*). Any other signatory country has secondary jurisdiction. A secondary jurisdiction assesses only whether it can domestically enforce the award; it cannot "annul" the award. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287–88 (5th Cir. 2004) (*Karaha II*). And a secondary jurisdiction can refuse to enforce an award only on the grounds listed in Article V of the Convention. *Id.* at 288.

This award was made in Sweden. It was also made under Swedish arbitration law. Although it might seem like Ukraine would provide the law governing the arbitration because the JAA's choice-of-law provision designates that country, that clause does not discuss procedural law. As a result, the Ukraine choice-of-law provision does not overcome the "strong presumption that designating the place of the arbitration also designates the law under which the award is made." *Karaha II,* 364 F.3d at 292; *see also* 3 GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION § 26.05[C][1][e][i][1], at 3463–65 (2d ed. 2014) (noting that a "general choice-of-law clause in [the] underlying contract" does not select the law governing the arbitration). So Sweden has primary jurisdiction. Other countries, including Ukraine and the United States, have secondary jurisdiction.

As a secondary jurisdiction, we can deny enforcement only on a ground listed in Article V.[5]  And we construe the Article V defenses to enforcement "narrowly[] 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts.'" *Karaha II*, 364 F.3d at 288 (quoting *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 335 (5th Cir. 1976)).

## A.

The first Article V ground for nonrecognition captures Ukrnafta's principal complaint.  It allows a court to deny recognition when the parties to the arbitration agreement were, "under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made."  CONVENTION art. V(1)(a).  Although Ukrnafta classifies its argument based on Carpatsky's change of domicile as one of contract "existence" rather than "validity," this is the place to consider both of those defenses.  Because Article V(1)(a) first discusses capacity, an issue of existence, a leading international arbitration treatise concludes that Article V.1(a) covers issues of both validity and existence.  3 BORN § 26.05[C][1][b], at 3452  ("Article V(1)(a) extends broadly to all issues concerning the validity of 'the agreement referred to in Article II,' including issues of capacity, existence, and validity."); *id.* § 26.05[C][1][c][ii], at 3457–59 (classifying claims of "nonexistence of the underlying contract" as Article V(1)(a) issues).

---

[5] Ukrnafta's Article II and IV challenges would not succeed even if we could consider them.  The JAA and its amendments, or at a minimum the pleadings in the arbitration, satisfy Article II's "agreement in writing" requirement.  Article IV is also satisfied because the district court had certified copies of the agreements; they were attached to Ukrnafta's motion for a preliminary injunction as well as Carpatsky's first motion to confirm the arbitration award.

No. 19-20011

Indeed, Ukrnafta recognizes that its concern about the seal goes to capacity. Boiled down, its contention is that Mr. Texas did not have the authority—that is, the capacity—to bind Carpatsky-Delaware because he used the Texas seal when signing the 1998 amendment. Capacity is determined by the "law applicable to" the party, rather than the law "to which the parties have subjected it" or the "law of the country where the award was made." CONVENTION art. V(1)(a). The "law applicable to the party" on a capacity question is the law of its domicile. 1 BORN § 4.07[A], at 626–27. That makes sense, as dispute resolution clauses in a contract do not have force unless the parties had the capacity to contract in the first place. *Edminster, Hinshaw, Russ & Assocs., Inc. v. Downe Twp.*, -- F.3d --, 2020 WL 1291637, at *2 (March 19, 2020).

Under Delaware law, Mr. Texas had authority to enter into the 1998 Amendment. He was the President of Carpatsky-Delaware. The agreement listed the party as "Carpatsky Petroleum Corporation, USA," with nothing in the contract stating it was the no-longer-existing Texas entity. That leaves the seal. As the arbitration tribunal correctly ruled, the postmerger use of the Texas seal was "irrelevant" under Delaware law; what mattered was that Mr. Texas was an authorized officer of the corporation whose signature bound the corporation. Ukrnafta's formalistic view of seals was outdated even a century ago. *See Rabinovich v. Liberty Morrocco Co.*, 125 A. 346, 347 (Del. 1924) (rejecting the argument that use of the "wrong" corporate seal meant there was no contract in favor of the "modern rule" that a corporation can "adopt pro hac vice . . . any other seal . . . as its own"); *Peyton-Du Pont Sec. Co. v. Vesper Oil & Gas Co.*, 131 A. 566, 567 (Del. Super Ct. 1925) (explaining that the "early common law" rule that "a corporation could act and speak only by the corporate seal . . . has been relaxed in this Country, if not abandoned" (citing 2 WILLIAM FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 754)).

10

Ukrnafta's larger point is that it did not know Carpatsky had reincorporated in Delaware when the parties agreed to the amendments. As reflected in some of its state-law claims, Ukrnafta appears to view the alleged nondisclosure of Carpatsky's change in domicile as a misstatement that fraudulently induced the amendments. Left unexplained is why a Ukrainian company would care whether its American partner was incorporated in Texas or Delaware.

In any event, and regardless whether this issue is one of contract existence or validity, Ukrnafta waived this argument by submitting to the jurisdiction of the Stockholm arbitration. *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 584 (5th Cir. 1980). A party cannot agree to arbitrate and then later tell a court that the arbitrator lacked authority to decide the case. *Id.*; 3 BORN § 26.05[C][1][h], at 3482 (noting that, even in the Article V(1)(a) context, it "is well-settled that a party can waive its right to challenge an arbitrator's jurisdiction, including the right to raise jurisdictional challenges in subsequent recognition proceedings"). This waiver rule prevents inefficiency and the gamesmanship that would result if a party could wait to see how the arbitration tribunal ruled before deciding whether to challenge its jurisdiction.

Even more than amounting to waiver, agreeing to an arbitration demand may constitute an independent agreement to arbitrate. *Piggly Wiggly*, 611 F.2d at 584. We have long recognized this principle for domestic labor arbitration, *see id.*, and it is no less applicable to international commercial arbitration, *see* 1 BORN § 5.02[A][2][j], at 692 (noting that "written submissions, not raising any objection to jurisdiction" are a "written agreement to arbitrate"); UNCITRAL MODEL LAW ON INTERNATIONAL COMMERCIAL ARBITRATION art. 7(5) (2006) (recognizing that an agreement in writing

includes "an exchange of statements of claim and defence in which the existence of an agreement is alleged by one party and not denied by the other").

That waiver—and the creation of a new written agreement to arbitrate— happened here.  The cover of Carpatsky's arbitration demand noted its domicile as "Delaware, United States" and the request later described it as "a company incorporated and organized under the laws of the State of Delaware, U.S.A."  So while the parties vigorously dispute whether Carpatsky told Ukrnafta of the change in the years before the arbitration, at a minimum Ukrnafta knew when it received the arbitration demand.  Yet Ukrnafta consented to the arbitration in its answer and did not contest jurisdiction in its statement of defense.

Ukrnafta finally challenged jurisdiction six months after filing its statement of defense.  But the tribunal decided that was too late, applying the Stockholm Chamber of Commerce rule that "any objections concerning the existence, validity or applicability of the arbitration agreement" must be raised no later than the statement of defense.  The Swedish courts agreed with this waiver finding.  We see no reason to override that procedural ruling of the court with primary jurisdiction over this arbitration and would reach the same conclusion even if we owed no deference.

Because Ukrnafta consented to the arbitration despite Carpatsky's twice identifying itself as a Delaware company, the Article V(1)(a) defense fails.

B.

So does Ukrnafta's argument that American courts cannot enforce the award because it was "unable to present [its] case."  CONVENTION art. V(1)(b). This article ensures that a court will enforce an arbitration award only if the arbitration afforded the parties the basic due process rights they would have received in the jurisdiction where enforcement is sought.  *Karaha II*, 364 F.3d at 298–99.  In the United States, those minimum procedural safeguards are

"adequate notice, a hearing on the evidence, and an impartial decision." *Id*. at 299. The more fulsome procedures of the Federal Rules of Civil Procedure are not required. *Id*. And just as a district judge hearing a case under the Federal Rules need not admit all relevant evidence—among other things, it may be cumulative, unreliable, or unduly prejudicial—an arbitrator need not allow all evidence. *Id*. at 300–01. Failure to admit evidence rises to a due process violation only when it "prejudices [the parties'] rights" to a fair hearing. *Id*. at 301 (quoting *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union de Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985) (Wisdom, J., by designation)). Examples that have led courts not to confirm domestic arbitration awards include refusals to consider the testimony of an essential witness, *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20–21 (2d Cir. 1997), or the only testimony available to a party, *Hoteles Condado Beach*, 763 F.2d at 40.

Ukrnafta's process complaints come nowhere close to due process violations. The tribunal held multiple hearings. The parties submitted witness statements, expert reports, and multiple rounds of briefing before and after the hearing. The merits hearing lasted four days with fifteen witnesses. That looks a lot like a full-blown federal trial. And in some ways the tribunal was more forgiving than a federal judge might be. It imposed no page limit on the posthearing briefs and allowed Ukrnafta to present some damages evidence after the evidentiary hearing. All of this was more than enough to allow Ukrnafta "to be heard 'at a meaningful time and in a meaningful manner.'" *Karaha II*, 364 F.3d at 299 (quoting *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992)).

As for Ukrnafta's specific concerns, the tribunal's ruling that the JAA's limitation of liability was unenforceable did not offend basic notions of due process. This issue arose when an arbitrator asked a Ukrnafta expert whether

the provision limiting damages to direct losses is enforceable under Ukrainian law when there is an intentional breach of contract. *See* CIV. CODE OF UKR. art. 614. The expert denied that Ukrainian law invalidated such provisions, but the tribunal advised that "[t]his may be one of the points on which the parties will certainly elaborate in the post-hearing briefs." Carpatsky did so, invoking the Ukrainian statute in its first round of posthearing briefing to argue that it could recover lost profits despite the limitation of liability. Ukrnafta responded in the second round of briefing, spending more than ten paragraphs arguing that the statute did not apply and that, in any event, there was no intentional breach.

The tribunal sided with Carpatsky and awarded lost profits, an outcome that Ukrnafta says it could not have "legitimately expect[ed]." And because it did not expect the tribunal to agree with an argument that Carpatsky did not advance until post-hearing briefing, Ukrnafta contends it was deprived of the opportunity to present evidence on the topic. But the developments that made Ukrnafta unhappy—the tribunal's raising of an issue; lax enforcement of preservation rules; its own incorrect prediction about how the tribunal would rule; and, at bottom, disagreement with a substantive ruling—are typical frustrations of a losing litigant. Nor was the tribunal's loose view of deadlines one-sided. Although the record is usually closed at the end of a trial, the tribunal allowed either party to submit a request if it "wishes now to file further documents." In fact, it allowed Ukrnafta to submit some evidence relating to damages after the hearing. Nothing about the tribunal's handling of the limitation of liability issue deprived Ukrnafta of a fair hearing.

Ukrnafta's next process complaint attacks another common feature of litigation: the factfinder's awarding damages in an amount different from what either party proposed. First off, Ukrnafta's premise is questionable. The parties hotly disputed how to account for the risk that Ukraine would continue

14

to heavily regulate the price of natural gas.  Ukrnafta's expert opined that the existing regulations would continue, resulting in no lost profits because the price was fixed at such a low level.  But in recognition of the possible repeal of the stringent price control—as Ukraine had told the IMF it was going to do—the damages expert provided an alternative model.  The tribunal appeared to accept this alternative discount rate when accounting for the uncertainty of future Ukrainian regulation.  It did not adopt Carpatsky's model, which called for much higher damages.  So while the award was not an amount either party proposed, the critical discount rate came from Ukrnafta's expert.

But the larger point is that a factfinder is not limited to the parties' damages calculations.  If that were the case, a great many trial verdicts would not stand.  *Cf. Outboard Marine Corp. v. Babcock Indus., Inc.*, 106 F.3d 182, 186 (7th Cir. 1997) (explaining that requiring a jury to explain its own damages calculation is contrary to the very idea of the jury system).  It does not violate due process for a factfinder to calculate its own damages.  Whether that damages ruling should stand on appeal is a merits question, not a process one.

The final reason why Ukrnafta says it was not allowed to "present its case" is that the tribunal excluded evidence of a new Ukrainian gas price regulation.  As noted, however, the tribunal did allow Ukrnafta to supplement the record after the hearing with evidence of new price regulation.  It was only around six months later—after the conclusion of all briefing and the tribunal's final evidentiary deadline, after which it would accept new submissions only in "exceptional circumstances"—that the tribunal did not allow new evidence about Ukraine's Natural Gas Act.  A proceeding must end at some point.  It did not violate due process for the tribunal to finally conclude that no more evidence would be allowed, especially on an issue that had been extensively litigated.

Ukrnafta has not identified anything about the arbitration that was fundamentally unfair.

## C.

Keeping the focus on lost profits, Ukrnafta next argues that the federal courts cannot enforce the award because it does not fall "within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." CONVENTION art. V(1)(c). In Ukrnafta's view, the award exceeded the terms of submission because it disregarded the limitation of liability.

Contrary to Ukrnafta's framing, this is a merits challenge to the tribunal's conclusion that Ukrainian law renders a limitation of liability unenforceable in cases of intentional breach. Right or wrong, the tribunal's answer to that question of statutory interpretation is not a ground for nonrecognition under Article V(1)(c). 3 BORN § 26.05[C][4][a], at 3542 ("Of course, Article V(1)(c) also does not apply where there is a challenge to the substantive decision of the arbitral tribunal on the merits of the parties' dispute."); *id.* § 26.05[C][4][e], at 3552 ("Challenges to awards under Article V(1)(c) are sometimes, mistakenly, based on objections to the arbitrators' substantive contract interpretations or legal conclusions."); *see also Karaha II*, 364 F.3d at 288 (explaining that Article V does not allow nonrecognition based solely on a "mistake of law or fact"). Ukrnafta is not the first party to characterize disagreement over a contractual limit on damages as a beyond-the-scope Article V(1)(c) problem. 3 BORN § 26.05[C][4][e], at 3553. But the Article V(1)(c) defense is much narrower, typically covering challenges that the arbitration resolved disputes beyond those the parties submitted. *Id.* § 26.05[C][4][a], at 3542. Given the limited role of this nonrecognition ground, courts have "virtually always rejected" efforts to turn it into a vehicle for

reconsidering an arbitral ruling on a limitation-of-liability provision. *See id.* § 26.05[C][4][e], at 3553. We likewise reject this attempt to do so.

### D.

Ukrnafta's next stop on its tour of the Article V nonrecognition factors is the defense for when the "composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties." CONVENTION art. V(1)(d). This allows Ukrnafta to rehash its principal argument that Carpatsky-Delaware was never a party to the amendments, leaving only the original agreement to arbitrate in Ukraine. But, as previously discussed, Ukrnafta waived its challenge to the Stockholm tribunal's jurisdiction. *See Karaha II*, 364 F.3d at 298 (party's failure to object to appointment of arbitrator waived Article V(1)(d) objection).

### E.

Ukrnafta's last Article V defense is that recognition of the award would be "contrary to the public policy" of the enforcing country, here the United States. CONVENTION art. V(2)(b). Because the idea behind international arbitration is to provide a neutral forum rather than litigate in either party's home court, we again apply this nonrecognition ground narrowly. It allows nonrecognition "only where enforcement would violate the forum state's most basic notions of morality and justice." *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1016 (5th Cir. 2015) (quoting *Karaha II*, 364 F.3d at 306).

Ukrnafta argues that American enforcement would be contrary to our interest in international comity. It contends that recognizing the award would disrespect the Ukrainian courts' holdings that the 1998 amendment was invalid because of Carpatsky's changed domicile. More than that, it argues it would violate Ukrainian law to enforce a contract that country's courts have deemed illegal.

To be sure, American courts account for comity concerns. *See Karaha I*, 335 F.3d at 371–74. Respect for foreign sovereigns may, for example, limit the extraterritorial reach of U.S. law. *Id.* at 371. But recognizing enforcement in this secondary jurisdiction does not apply U.S. law in another country. Nor does it resolve whether the award would be enforced in Ukraine or satisfied with assets located in Ukraine. It is not even a merits ruling; recognition means only that none of the limited grounds for not recognizing the arbitration award applies. And what would an American nonrecognition ruling say to the Swedish court that confirmed the arbitration award? Given the conflicting rulings of foreign courts, comity concerns are a wash. But even if comity pointed in one direction, Ukrnafta cites no American (or foreign) case recognizing a defense under the Convention's "public policy" provision on the ground that the home court of one of the parties had repudiated the award.

That absence of caselaw is not surprising because on the other side of possible comity concerns is the strong policy favoring international arbitration. *See Newco, Ltd. v. Government of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016) (rejecting "public policy" defense because the interest in "international comity" did not "override" the policy favoring arbitration). That policy led us to reject an Indonesian court's annulment of an arbitration award made in Switzerland under Swiss procedural law as a defense to recognition. *Karaha II*, 364 F.3d at 309–10 (holding that "the Indonesian court's annulment ruling is not a defense to enforcement under the New York Convention"). Allowing the annulment rulings of a party's home jurisdiction to prevent enforcement of an arbitration award would gut international arbitration and interfere with the global commerce it promotes. As the Supreme Court recognized decades ago, international arbitration "obviates the danger that a dispute . . . might be submitted to a forum hostile to the interests of one of the parties." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974). A business may be even more

18

fearful of a home court advantage when its counterparty is, like Ukrnafta, state owned.

Giving a party's home court veto power over recognition actions in American courts would thus undermine our "emphatic" policy favoring arbitration, which "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Enforcing this award would further American policy, not contravene it.

## F.

Ukrnafta's final recognition defense is that the tribunal "manifestly disregarded" the Ukrainian statute of limitations. But the Convention allows us to "refuse enforcement only on the grounds specified in Article V." *Karaha II*, 364 F.3d at 288. Manifest disregard is not listed in Article V. We have rejected manifest disregard as a nonstatutory basis for vacating domestic arbitration awards. *See Citigroup Global Mkts. Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009). There is no reason to add it as a ground of nonrecognition for international arbitrations.[6] *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 20–23 (2d Cir. 1997); *M&C Corp. v. Erwin Behr GmbH & Co.*, 87 F.3d 844, 851 (6th Cir. 1996) (both concluding that manifest disregard is not an Article V basis for nonrecognition of an international arbitration award). That is especially the case when the Article V focus on jurisdiction and process reflects the inability of a secondary jurisdiction to second guess the merits rulings of the arbitration tribunal that the parties

---

[6] Nor does *Karaha II* treat manifest disregard as a freestanding defense. 364 F.3d at 290. It merely mentions the phrase in one sentence, while analyzing challenges to the arbitral award under specific Article V defenses. *See id.* at 294–96, 298, 305. And *Karaha II* predates *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), the Supreme Court decision that led us to reject manifest disregard as an FAA ground for vacatur. *Citigroup Global Mkts.*, 562 F.3d at 355.

agreed should decide their dispute. *Karaha II*, 364 F.3d at 288 ("Absent extraordinary circumstances, a confirming court is not to reconsider an arbitrator's findings." (quotations omitted)). Ukrnafta's manifest disregard defense fails.

As Ukrnafta has not established any nonrecognition ground, we affirm the district court's confirmation of the award.

IV.

The remaining issue is whether Ukrnafta can still pursue the state-law claims that started this lawsuit. The district court thought it could not because of issue preclusion. We conclude that the sibling doctrine of claim preclusion provides a more straightforward approach to the same result.

At the outset, we note that arbitral decisions may have preclusive effect as long as the "proceeding afford[ed] basic elements of adjudicatory procedure." *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 188 (5th Cir. 2014) (addressing issue preclusion); *see also NTCH-WA, Inc. v. ZTE Corp.*, 921 F.3d 1175, 1181–84 (9th Cir. 2019) (applying claim preclusion to arbitral award); *cf. Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 F. App'x 617, 620–24 (5th Cir. 2015) (addressing claim preclusion but deciding the case on other grounds). If the law were otherwise, arbitrations would not result in "conclusive resolution of disputes" and would carry the risk of "inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–54 (1979).

For many of the same reasons we cited in rejecting Ukrnafta's due process challenge to the arbitration award, this international arbitration easily satisfies the basic requirements of procedural fairness that allow it to have preclusive effect. Ukrnafta was represented by counsel, submitted evidence and argument in multiple rounds of briefing, and examined witnesses in a four-day hearing. *See Grimes*, 746 F.3d at 188 (citing *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360–61 (11th Cir. 1985)) (mentioning these as

relevant inquiries).  There is no suggestion that the arbitral tribunal, selected via the common procedure of each side's naming an arbitrator and those arbitrators' then agreeing on a third, was biased.  Even the Ukrnafta-selected arbitrator agreed with the result.  The tribunal, operating under the respected Arbitration Institute of the Stockholm Chamber of Commerce, provided fair and full process.

We thus can give the arbitral ruling the same preclusive effect we would give a judicial ruling.  Claim preclusion applies when: (1) the parties are the same; (2) a court with jurisdiction rendered the prior judgment; (3) the prior judgment was final and on the merits; and (4) both actions involve the "same claim or cause of action."  *ASARCO, L.L.C. v. Mont. Res. Inc.*, 858 F.3d 949, 956 (5th Cir. 2017) (citation omitted).  Importantly, *res judicata* also attaches to claims that could have been brought in the earlier proceeding.  *Id.* at 955.

Ukrnafta mainly challenges the "same claim" requirement.[7]  We apply a transactional test that looks at whether the claims in the second suit "arise[] from the same nucleus of operative facts as the prior claims."  *Id.* at 956.  We consider "whether the facts are related in time, space, origin, or motivation; whether they form a convenient trial unit; and whether their treatment as a unit conforms to the parties' expectations . . . ."  *Oreck Direct LLC v. Dyson Inc.*, 560 F.3d 398, 402 (5th Cir. 2009) (quotations and alterations omitted).

Ukrnafta contends that its tort claims are not derived from the same nucleus of facts as the arbitrated contract claims, which stemmed from its barring Carpatsky's participation in the venture.  But that view is too narrow.  Both the arbitration and this suit revolve around the JAA, the amendments, the parties' activity under those contracts, and the effect, if any, of Carpatsky's change of domicile.  Indeed, that latter issue of Carpatsky's "covering up" its

---

[7] Ukrnafta also asserts that the tribunal lacked jurisdiction, but we have already held that Ukrnafta consented to the arbitration.

merger underlies Ukrnafta's tort claims. Its view that Carpatsky-Delaware never became its business partner is why it believes that entity stole trade secrets, engaged in fraud, unjustly enriched itself, etc.

Ukrnafta cannot dispute that the arbitration focused on these events. Instead, it responds that it asserted Carpatsky's change of domicile as a defense, rather than as an affirmative claim. But this is where the corollary we mentioned kicks in: preclusion attaches to claims parties could have asserted, not just ones they did assert. *ASARCO*, 858 F.3d at 955. The arbitration involved the same transactions—the JAA, its amendments, and Carpatsky's change of domicile—that Ukrnafta's state claims turn on. It could have pursued those claims in arbitration, so it is precluded from asserting them now.

\* \* \*

The judgment is AFFIRMED.