# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2024

Lyle W. Cayce
Clerk

No. 22-11072

In The Matter of Steven Andrew Clem,

*Debtor.*

Steven Andrew Clem,

*Appellant,*

*versus*

LaDainian Tomlinson; LaTorsha Tomlinson,

*Appellees.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-1200

Before Elrod, *Chief Judge,* and Jones, and Barksdale, *Circuit Judges.*
Edith H. Jones, *Circuit Judge*:

Defendant-Debtor Steven Andrew Clem, the former owner of a defunct homebuilding company, appeals a sizeable judgment for

nondischargeability of a debt incurred in connection with a failed project. After an arbitration panel found Clem personally liable to Plaintiffs LaDainian and LaTorsha Tomlinson for breach of contract and violations of the Texas Deceptive Trade Practices Act ("DTPA"), Clem filed a Chapter 7 bankruptcy case. In this subsequent adversary proceeding brought by the Tomlinsons, the bankruptcy court determined that because Clem had obtained over $660,000 from them through "false representation" or "false pretenses," the debt was not dischargeable. *See* 11 U.S.C. § 523(a)(2)(A). But we conclude that the bankruptcy court erred in failing to apply collateral estoppel to the findings in an underlying arbitration, *see generally In re Amberson*, 73 F.4th 348, 350–51 (5th Cir. 2023), and also erred in its interpretation of a fraud-by-nondisclosure claim. We REVERSE and RENDER judgment for Clem.

## I. Background

Clem was chief executive officer of Bella Vita Custom Homes, LLC. In April 2015, the Tomlinsons signed a contract (the "Contract") with Bella Vita to construct a $4.5 million luxury home for them north of Dallas, Texas. The Tomlinsons' home was planned to be 18,000 square feet and would be the largest house that Bella Vita had ever built. The project quickly ran into problems. As one example, the bankruptcy court found that the "Tomlinsons grew frustrated with Bella Vita for its alleged failure to account for usages of the Tomlinsons' 10 [percent] initial deposit and subsequent draw requests." Bella Vita failed to inform the Tomlinsons immediately when it punctured a water line while preparing the foundation and caused extensive flooding on the building pad and adjacent land. A neighbor first

advised them about the flooding. Four months after entering into the Contract, and after they had paid Bella Vita over $650,000, the Tomlinsons terminated the Contract.

There were other problems. The bankruptcy court also found that, during construction, Bella Vita "undertook undisclosed/unapproved construction changes."

> Specifically, Bella Vita made the decision to utilize helical steel piers on the large Home—something atypical and that [Clem] and Bella Vita had no experience using in the past—instead of the concrete piers that were specified in the Contract's original design plans. Bella Vita made this decision after encountering subsurface water when drilling holes for the contemplated concrete piers.

The choice of helical piers violated the Contract, which provided that any change in the building plans required disclosure and written approval by the Tomlinsons.

The Tomlinsons promptly filed suit against Clem and Bella Vita in state court in Tarrant County, Texas. The state court ordered the parties to arbitrate through the American Arbitration Association. In the arbitration, the Tomlinsons asserted claims against Bella Vita and Clem, including (1) breach of contract/breach of warranty, (2) negligence and malice/gross negligence, (3) negligent misrepresentation, (4) various violations of the DTPA, (5) fraud and fraud in the inducement or by nondisclosure, (6) fraud in a real estate transaction, (7) unconscionable, knowing, or intentional course of action, and (8) conversion. They also pled other doctrines or remedies, including estoppel, alter ego, and joint enterprise.

No. 22-11072

A year later, the three-person arbitration panel awarded $744,711 in damages to the Tomlinsons against Bella Vita and Clem jointly and severally. The state court adopted the arbitration award in a final judgment several days later. The arbitration award includes twenty very specific findings of fact and conclusions of law. Relevant here, Finding 16 states that "the actions of Clem and Bella Vita, acting through Clem, violate the provisions of the DTPA and they are a producing cause of economic damage to the Tomlinsons." Finding 17 states that "[t]he actions of Clem and Bella Vita do not constitute a *knowing* violation of the DTPA." (emphasis added).[1] Further, although in Finding 20, the arbitration panel found that "the evidence supports both a breach of contract cause of action and a DTPA cause of action against Bella Vita," it denied the Tomlinsons' claims for negligence and gross negligence as barred by the Texas economic loss rule.

Significantly, the arbitration panel also denied the Tomlinsons' claims for "misrepresentation, fraud, [and] fraud in the sale of real estate." The arbitrators noted (Finding 14) that Clem "failed to inform the Tomlinsons that steel helical piers were installed rather than the concrete piers called for by the Contract plans and specifications." And in Finding 15, "Clem represented that a builder's risk policy for the Residence had been purchased when, in fact, the purchase had not been made." But the panel found that the Tomlinsons' misrepresentation and fraud and other such claims "were not sustained by a preponderance of the evidence."

---

[1] Knowing violations of the DTPA enable a plaintiff to obtain mental anguish damages. Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ Sec. 17.50(b)(1).

4

No. 22-11072

Shortly after the adverse judgment was entered, Clem filed a Chapter 7 bankruptcy case in December 2016, and the Tomlinsons responded with this adversary proceeding claiming non-dischargeability of the entire arbitration judgment owed them under 11 U.S.C. § 523(a)(2)(A). According to the Tomlinsons' First Amended Complaint, Clem made multiple false representations in connection with the Contract on which the Tomlinsons relied to their detriment. Their pleading alleged pre-contract fraud claims. The parties filed cross-motions for summary judgment, which the bankruptcy court denied.

Trial took place on two days in August and October, 2017. According to the bankruptcy court, a new legal theory "seemed to emerge" over the course of the two days. Under this theory, after entering the Contract, Clem and Bella Vita had concealed material information with regard to installing the helical piers and puncturing the water line, how the initial ten percent deposit (almost $450,000) had been spent, and whether Bella Vita had purchased a Builder's Risk insurance policy for the project. The court raised as an issue whether the Tomlinsons were fraudulently induced to stay in the Contract longer than they otherwise would have done. Based on this "evolution," the Tomlinsons sought leave to file a second amended complaint including the new legal theory, and the bankruptcy court granted the motion over Clem's objections.

On the same day that it approved the amended complaint, the bankruptcy court issued findings of fact and conclusions of law awarding the Tomlinsons $664,590.93 as a nondischargeable debt under

5

Section 523(a)(2)(A).[2] The court held that its factual findings "form[ed] the basis for an ultimate finding of fraud or fraud by nondisclosure." *First*, Clem committed fraud by nondisclosure during performance of the Contract by failing to inform the Tomlinsons of the switch from concrete piers to helical steel piers and failing to inform them timely about the punctured water line. *Second*, Clem committed fraud by "personally supervis[ing] reports going out to the Tomlinsons . . . that created the false impression that . . . the Tomlinsons' money had been used to acquire a Builder's Risk Policy" when in reality no such policy had been purchased. *Third*, Clem committed fraud by nondisclosure by failing "to provide invoices and other documentation to the [Tomlinsons] regarding expenditures on their Home project." The bankruptcy court concluded that Clem's debt was not dischargeable and entered judgment on January 3, 2018.

Clem quickly moved for reconsideration. The court reopened the record on the two concealment/nondisclosure issues only and set Phase 2 of the trial on those issues. After hearing evidence, the court denied the motion for reconsideration because "[t]he supplemental evidence did not persuade the court to change its earlier findings and conclusions." The court reconfirmed its original judgment.

The district court affirmed the bankruptcy court in full in a lengthy opinion that found no reversible error on any of the issues appealed by Clem. Clem filed a timely appeal.

---

[2] In combination with a previous sanctions award, the total award exceeded $680,000.

No. 22-11072

## II. Analysis

Like the district court, this court reviews the bankruptcy court's findings of facts for clear error. *In re Sims*, 994 F.2d 210, 217 (5th Cir. 1993). Its conclusions of law are reviewed de novo. *In re Keaty*, 397 F.3d 264, 269 (5th Cir. 2005). Issues concerning collateral estoppel are issues of law. *In re Amberson*, 73 F.4th at 350. Clem and the Tomlinsons debate numerous procedural and substantive issues pertaining to the judgment, but we need only review Clem's contentions that the specific grounds of nondischargeability found by the bankruptcy court are barred by collateral estoppel arising from the arbitration proceeding or by Texas law.

### A. General Principles

The doctrine of collateral estoppel (issue preclusion) "bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit." *In re Miller*, 156 F.3d 598, 601 (5th Cir. 1998) (quoting *In re Garner*, 56 F.3d 677, 679 (5th Cir. 1995) (citations omitted)). Under Texas law,[3] "[a] party seeking to invoke the doctrine of collateral estoppel must establish" three elements. *In re Miller*, 156 F.3d at 602 (quoting *In re Garner*, 56 F.3d at 680 (citations omitted)). These elements are:

---

[3] "When giving preclusive effect to a state court judgment, this court must apply the issue preclusion rules of that state." *In re Keaty*, 397 F.3d at 270. A Texas Court of Appeals has held that the same principles apply to arbitration awards as to state court judgments. *Casa del Mar Ass'n v. Gossen Livingston Assocs.*, 434 S.W.3d 211, 219 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

> (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action;
>
> (2) those facts were essential to the judgment in the first action; and
>
> (3) the parties were cast as adversaries in the first action.

*Id.* "The party asserting issue preclusion bears the burden of proof and hence would have the burden of bringing forward an adequate state-court record." *In re King*, 103 F.3d 17, 19 (5th Cir. 1997) (internal citations omitted).

Like prior court judgments, prior "arbitral decisions may have preclusive effect." *In re Amberson*, 73 F.4th at 350 (applying Texas law and quoting *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487, 503 (5th Cir. 2020)). Here, like the bankruptcy and district courts, we apply the principles of collateral estoppel to the arbitration ruling, which was confirmed as a judgment in state court.

"The Supreme Court has explicitly stated that collateral estoppel, or issue preclusion, principles apply in bankruptcy dischargeability proceedings." *Id.* (quoting *In re Schwager*, 121 F.3d 177, 181 (5th Cir. 1997) (citing *Grogan v. Garner*, 498 U.S. 279, 285 n.11, 111 S. Ct. 654, 658 n.11 (1991))). But in such cases, this court holds that collateral estoppel applies only in "limited circumstances." *In re Dennis*, 25 F.3d 274, 278 (5th Cir. 1994). Dischargeability is determined "in bankruptcy court," not "earlier in state court at a time when [dischargeability] concerns 'are not directly in issue and neither party has a full incentive to litigate them.'" *Archer v. Warner*, 538 U.S. 314, 321, 123 S. Ct. 1462, 1467 (2003) (quoting *Brown v. Felsen*, 442 U.S. 127, 134, 99 S. Ct. 2205, 2211 (1979)). For collateral

estoppel to apply in this context, the first court must have "made specific, subordinate, factual findings on the identical dischargeability issue in question—that is, an issue which encompasses the same *prima facie* elements as the bankruptcy issue." *In re Dennis*, 25 F.3d at 278.

Further analysis continues with the Bankruptcy Code, which exempts from discharge a debt for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To have a debt excepted from discharge under Section 523(a)(2)(A), a creditor must prove that: (1) the debtor made a representation or engaged in other fraudulent conduct; (2) at the time the representation was made, the debtor knew it was false; (3) the debtor made the representation with the intention to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representation. *Saenz v. Gomez*, 899 F.3d 384, 394 (5th Cir. 2018). These "elements of actual fraud . . . generally correspond with the elements of common law fraud in Texas[.]" *Id.*[4] Dischargeability is determined in bankruptcy law by the preponderance of the evidence. *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661.

---

[4] If anything, the elements of nondischargeability may be more onerous than those for fraud in Texas, as this court applies Section 523(a)(2)(A) only where a debt has been "obtained by frauds involving 'moral turpitude or intentional wrong, and any misrepresentation must be knowingly and fraudulently made.'" *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (quoting *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1995)).

No. 22-11072

Under Texas law, fraud occurs when:

> (1) the defendant misrepresented a material fact; (2) the defendant knew the material representation was false or made it recklessly without any knowledge of its truth; (3) the defendant made the false material representation with the intent that it should be acted upon by the plaintiff; and (4) the plaintiff justifiably relied on the representation and thereby suffered injury.

*United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005). "The first requirement of this test can be met if the defendant concealed or failed to disclose a material fact when a duty to disclose existed." *Id.*

Fraud by nondisclosure is a subcategory of fraud that requires a plaintiff to prove that:

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019) (citations omitted).

### B. The Bankruptcy Court's View of Collateral Estoppel

The bankruptcy court conscientiously referenced the general principles of collateral estoppel and Texas substantive law, but it concluded that collateral estoppel did not bar its retrial of the Tomlinsons' claims under Section 523(a)(2)(A). The court's reasoning largely relies on this court's

decision in *In re King*, 103 F.3d at 17, culminating in *King's* admonition that "[t]he fact that a state court labels a judgment 'contract damages' rather than 'fraud damages' does not control the bankruptcy court if the state court's determination did not necessarily include a finding regarding the dischargeability issue (*i.e.*, whether the debt was obtained by false pretenses, a false representation, or actual fraud)." *Id.* at 20.

Several steps precede the bankruptcy court's conclusion. Initially, the court noted "confusi[on]" because the arbitration award did not identify which provisions of the Texas DTPA were combined with Contract violations. The court found no "discernible record" from the arbitration proceedings sufficient to persuade it that the panel "made specific, subordinate, factual findings on the identical dischargeability issue in question." *See In re Dennis*, 25 F.3d at 278. The court declared it could not discern whether "identical" legal issues had led to the finding of non-identified DTPA violations. And the court found "most troubling" its hypothetical speculation that parties to an arbitration may choose to pursue DTPA claims that are easier to prove than fraud, because of the DTPA's lower intent standards. In sum, the court held that there was "no evidence" that the plaintiffs had fully and fairly litigated common law fraud claims.[5]

We disagree with the bankruptcy court's overly narrow interpretation of the arbitral award. There is no question that several theories of fraudulent

---

[5] As the court put it more colloquially: "Is it fair or appropriate—in a situation like this—to preclude creditors from pursuing Section 523 allegations, in the new venue of bankruptcy court, simply because they may *only* have prevailed on DTPA (and breach of

misrepresentation or omission were placed squarely before the three-member panel, and the panel addressed the facts and legal conclusions as to each. The fraud claims still in issue here involve the unapproved replacement of concrete piers with helical piers, in conjunction with the contractor's failure immediately to disclose the underground water main breach, and whether a Builder's Risk insurance policy had been procured by Bella Vita. As outlined earlier, the arbitration panel expressly found Clem did not inform the Tomlinsons about the helical piers (or obtain their approval), and he misrepresented that the insurance policy had been purchased. The arbitration panel found breach of contract in a number of actions by Clem and Bella Vita, several of which are no longer mentioned in this litigation. And in a single declarative sentence, the panel found both a breach of contract cause of action and a DTPA cause of action. But critically, the arbitrators also concluded that the Tomlinsons' misrepresentation and fraud claims "were not sustained by a preponderance of the evidence." And it found that Clem's actions "do not constitute a knowing violation of the DTPA."

When an issue "that forms the basis for the creditor's theory of nondischargeability has been actually litigated in a prior proceeding, neither the creditor nor the debtor may relitigate those grounds." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1294 (5th Cir. 1995), *abrogated on other grounds by Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 136 S. Ct. 1581 (2016). Although

_____

contract) claims in prepetition litigation/arbitration? This court thinks not." (footnote omitted).

other cases may pose challenges in identifying the extent to which issues were "actually litigated" in arbitration proceedings, the structure of this arbitration award satisfies the collateral estoppel standard our court has repeatedly laid out: "specific, subordinate, factual findings on the identical dischargeability issue in question." *See In re Dennis*, 25 F.3d at 278 (cited by *In re King*, 103 F.3d at 19; *In re Keaty*, 397 F.3d at 271). The bankruptcy court erred in holding that more specific DTPA findings were required, when the panel explicitly held there was no "knowing" DTPA violation by Clem. The absence of any "knowing" violation necessarily precludes a finding of recklessness, much less an intentional violation. Consequently, the bankruptcy court erred in theorizing that issues that were litigated in the arbitration were not identical to the fraud issues underlying the Section 523(a)(2)(A) claim. *Saenz*, 899 F.3d at 394.[6]

Further, "[t]he requirement that an issue be 'actually litigated' for collateral estoppel purposes simply requires that the issue is raised, contested by the parties, submitted for determination by the court, and determined." *In re Keaty*, 397 F.3d at 272 (citing *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986); *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451,

---

[6] *In re King*, relied on by the bankruptcy court and the Tomlinsons, is factually distinguishable because in that case, a state court had refused to render judgment on the creditor's fraud claim after a jury trial. In federal court, therefore, there was no final and binding ruling on an issue of fraud that could preclude relitigation under the nondischargeability provision. As this court stated, "the bare fact that the state court awarded only contract rather than fraud damages does not preclude the bankruptcy court from inquiring into the true nature of that debt." *In re King*, 103 F.3d at 19. Here, in contrast, the arbitration award negates "knowing" DTPA violations as well as the fraud claims. There is no "gap" in the award for the bankruptcy court to fill.

459–460 (5th Cir. 1971)). The arbitration panel's findings and conclusions covered the necessary issues. As Clem argues, it would be illogical to conclude that the issues pertinent to nondischargeability were not presented to and determined by the arbitrators when precisely such issues were referenced in their award. The bankruptcy court's concern about a lack of full and fair litigation is contrary to the arbitration award, and in any event it proves too much. Even a default judgment's recitations may be issue preclusive in Texas law. *See, e.g.*, *In re Jones*, 655 B.R. 868, 879 (Bankr. S.D. Tex. 2023).

For these reasons, the Tomlinsons are collaterally estopped from relitigating whether Clem's conduct amounted to intentional fraud, false pretenses or misrepresentations under Section 523(a)(2)(A) as to the helical piers and water line break or the failure to obtain Builder's Risk insurance.

On one remaining issue, however, the arbitration award lacks specific findings. The sole fact that the Tomlinsons' Statement of Claims in the arbitration asserts that Clem and Bella Vita failed to provide fiduciary management of construction funds is insufficient to show that the issue was actually "determined" by the arbitration panel. *In re Keaty*, 397 F.3d at 272. Instead, for collateral estoppel to apply, the party asserting preclusion must show a final determination of the issue on the face of the arbitration award. The award is silent, however, about Clem's failure to account to the Tomlinsons for his disposition of several hundred thousand dollars from their Initial Deposit under the Contract. Accordingly, we cannot conclude that the bankruptcy court erred in allowing relitigation of this issue that was not

collaterally barred by the arbitration proceeding. But that does not end the matter.

## C. Fraudulent Misrepresentation While Performing a Contract

Unlike the Tomlinsons' First Amended Complaint in the adversary proceeding, which asserted that Clem knowingly made false misrepresentations to induce the Tomlinsons to enter into the Contract, their Second Amended Complaint alleges that Clem fraudulently induced them to *stay* in a contract. Clem challenged whether this new theory of fraudulent nondisclosures made to string out the performance of a contract is viable under Texas law. But, accepting this new theory, the bankruptcy court held that Clem fraudulently failed to disclose invoices and documentation necessary to show that the Tomlinsons' up-front payments were used only on their house project. As the bankruptcy court put it, "during the performance of the Contract, the Defendant-Debtor personally participated in concealing how the Tomlinsons' funds had been spent with the intention of inducing his famous clients to stay in the lucrative Contract."

The bankruptcy court could not have been clearer that there was no fraudulent intent *at the time Clem and the Tomlinsons entered into the Contract*. Nor did it deny that the charged conduct breached the Contract. Instead, the bankruptcy court concluded that Clem was under a duty to disclose how the Tomlinsons' funds were being spent because Clem had previously represented that their Initial Deposit had been spent on "soft costs." The Tomlinsons were led to believe the money had actually been expended properly under the Contract. This, the bankruptcy court concluded, meant

15

that Clem had made "partial disclosure[s] that convey[ed] a false impression."

More specifically, the bankruptcy court found that:

[A]fter the contract was signed, Bella Vita repeatedly failed to fully account for the Initial [10%] Deposit, *even after repeated requests from Mrs. Tomlinson*. [emphasis added]. Specifically, the court makes note of at least two or three cost-reconciliations that were sent to the Plaintiffs-Creditors, in which there was a failure to fully account for where the Initial Deposit was actually spent (despite previously representing to the Plaintiffs-Creditors in prior draw requests that the entire Initial Deposit had been expended on "soft costs").

The court went on to reason as follows:

. . . Texas courts have held that there is a duty to disclose "when one makes a partial disclosure and conveys a false impression." Here, such a duty clearly existed in light of the fact that the first two draw requests showed that the Initial Deposit had been completely utilized on "soft costs," creating a false impression that the Initial Deposit had actually been spent on the Plaintiffs-Creditors' home. *Yet, in subsequent reconciliations produced by the Defendant-Debtor, it became clear that Defendant-Debtor was unable to account for a significant portion of the Initial Deposit. Thus, the Defendant-Debtor was clearly under a duty to disclose to the Plaintiffs-Creditors how he had or had not spent the Initial Deposit.* [emphasis added].

Under these facts, it is impossible to distinguish breach of contract from what the court thought "slipped into the category of fraudulent disclosure." First, as highlighted above, Mrs. Tomlinson repeatedly requested an accounting for the use of the Initial Deposit—an accounting clearly required by the Contract. Therefore, the Tomlinsons knew that the Debtor was not showing them how he utilized their Initial Deposit. Second,

as highlighted above, the Debtor's subsequent reconciliations just as clearly showed his unwillingness or inability to account for the Initial Deposit, again in plain breach of the Contract. That the theories of contract breach and fraudulent nondisclosure are identical is reinforced by the bankruptcy court's finding that damages, equaling the amount of two subsequent draw requests that the Tomlinsons paid before pulling out of the Contract, are based only on the Contract.

Texas law generally holds that a failure to disclose information does not constitute fraud unless there is a duty to speak. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Whether a duty to disclose arises poses a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Such a duty may arise under several limited categories, including, *inter alia*, whether the parties share a confidential or fiduciary relationship, or, pertinent here, where one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth "lest his partial disclosure convey a false impression." *Lewis v. Bank of Am.*, *N.A.*, 347 F.3d 587, 588 (5th Cir. 2003) (quotation and citations omitted).

The Tomlinsons' relationship with Bella Vita and Clem arose solely from their Contract, and the omissions in question constituted express breaches of contract. Despite its recitation of the general principles surrounding fraudulent nondisclosure, the bankruptcy court's conclusion was not supported by any remotely similar Texas case law. Nor have the Tomlinsons' briefs nor this court's considerable research uncovered

fraudulent nondisclosure cases that so comprehensively overlap mere breach of contract actions.[7]

The reason for this dearth of relevant law probably lies in the distinction that the Supreme Court of Texas has drawn between contract and tort causes of action. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 44–45 (Tex. 1998). In *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991), the state court explained:

> If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract.

---

[7] Cases cited by the bankruptcy court involve fundamentally different facts or bare statements of the generally applicable principles of Texas fraudulent nondisclosure. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008) (fraudulent inducement to enter a contract); *Lewis*, 347 F.3d at 588 (no justifiable reliance on banker's tax advice); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 481 (5th Cir. 2000) (no employer duty to disclose to employee); *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 143 (5th Cir. 2004) (affirming verdict in favor of defendant on fraudulent nondisclosure in commercial transaction).

Applying that law here, the Tomlinsons' claims for accounting deceptions sound in breach of contract but not fraud. As such, they are not nondischargeable under Section 523(a)(2)(A).

Clem's failure to provide accurate and timely accounting of how the Tomlinsons' money was spent does not give rise to liability independent of the Contract and yielded losses only to two further progress payments, *i.e.*, the subject matter of the underlying Contract. But "the mere failure to perform a contract is not evidence of fraud." *Formosa Plastics Corp. USA*, 960 S.W.2d at 48. We must disagree with the bankruptcy court's adherence to the theory of fraudulent nondisclosure in this case.

Further support for our conclusion is found in this court's decision in *Union Pacific Resources Group v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 590 (5th Cir. 2001). The defendant contended, citing *DeLanney*, that its alleged omissions related only to the parties' contract and could not be the subject of fraudulent nondisclosure. Rejecting that argument for purposes of summary judgment, *id.* at 591, this court held that the defendant had *voluntarily* undertaken disclosures above and beyond the parties' contractual requirements and thus "assumed an obligation . . . to correct any false impressions conveyed by [its] partial disclosures." *Id.* at 590. Whether *Rhone-Poulenc* applied the law properly to the facts may be debated. *See* 247 F.3d at 591–93 (GARWOOD, J., dissenting). In any event, there is no evidence here that Clem undertook any extracontractual obligation and thereby submitted to any addition tort-based duty of disclosure. The bankruptcy court's conclusion that Clem's breach of contract amounted to nondischargeable fraudulent nondisclosure must be reversed.

No. 22-11072

## IV. Conclusion

For the foregoing reasons, we REVERSE the bankruptcy court's judgment and RENDER judgment for Clem.